# NEW YORK *v.* QUARLES

No. 82–1213.   Argued January 18, 1984—Decided June 12, 1984

650

*Steven J. Rappaport* argued the cause for petitioner. With him on the briefs were *John J. Santucci* and *Richard G. Denzer.*

*David A. Strauss* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Trott,* and *Deputy Solicitor General Frey.*

*Steven J. Hyman* argued the cause and filed a brief for respondent.

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Benjamin Quarles was charged in the New York trial court with criminal possession of a weapon. The trial court suppressed the gun in question, and a statement made by respondent, because the statement was obtained by police before they read respondent his "*Miranda* rights." That ruling was affirmed on appeal through the New York Court of Appeals. We granted certiorari, 461 U. S. 942 (1983), and we now reverse.[1] We conclude that under the circumstances involved in this case, overriding considerations of public safety justify the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon.

On September 11, 1980, at approximately 12:30 a. m., Officer Frank Kraft and Officer Sal Scarring were on road patrol in Queens, N. Y., when a young woman approached their car. She told them that she had just been raped by a black male, approximately six feet tall, who was wearing a black jacket with the name "Big Ben" printed in yellow letters on the back. She told the officers that the man had just entered

---

[1] Although respondent has yet to be tried in state court, the suppression ruling challenged herein is a "final judgment" within the meaning of 28 U. S. C. § 1257(3), and we have jurisdiction over this case. In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975), we identified four categories of cases where the Court will treat a decision of the highest state court as final for § 1257 purposes even though further proceedings are anticipated in the lower state courts. This case, which comes to this Court in the same posture as *Michigan* v. *Clifford*, 464 U. S. 287 (1984), decided earlier this Term, falls within the category which includes "those situations where the federal claim has been finally decided . . . but in which later review of the federal issue cannot be had, whatever the ultimate outcome of the case." 420 U. S., at 481. In this case should the State convict respondent at trial, its claim that certain evidence was wrongfully suppressed will be moot. Should respondent be acquitted at trial, the State will be precluded from pressing its federal claim again on appeal. See *California* v. *Stewart*, 384 U. S. 436, 498, n. 71 (1966) (decided with *Miranda* v. *Arizona*).

an A & P supermarket located nearby and that the man was carrying a gun.

The officers drove the woman to the supermarket, and Officer Kraft entered the store while Officer Scarring radioed for assistance. Officer Kraft quickly spotted respondent, who matched the description given by the woman, approaching a checkout counter. Apparently upon seeing the officer, respondent turned and ran toward the rear of the store, and Officer Kraft pursued him with a drawn gun. When respondent turned the corner at the end of an aisle, Officer Kraft lost sight of him for several seconds, and upon regaining sight of respondent, ordered him to stop and put his hands over his head.

Although more than three other officers had arrived on the scene by that time, Officer Kraft was the first to reach respondent. He frisked him and discovered that he was wearing a shoulder holster which was then empty. After handcuffing him, Officer Kraft asked him where the gun was. Respondent nodded in the direction of some empty cartons and responded, "the gun is over there." Officer Kraft thereafter retrieved a loaded .38-caliber revolver from one of the cartons, formally placed respondent under arrest, and read him his *Miranda* rights from a printed card. Respondent indicated that he would be willing to answer questions without an attorney present. Officer Kraft then asked respondent if he owned the gun and where he had purchased it. Respondent answered that he did own it and that he had purchased it in Miami, Fla.

In the subsequent prosecution of respondent for criminal possession of a weapon,[2] the judge excluded the statement, "the gun is over there," and the gun because the officer had not given respondent the warnings required by our decision in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), before asking

---

[2] The State originally charged respondent with rape, but the record provides no information as to why the State failed to pursue that charge.

him where the gun was located. The judge excluded the other statements about respondent's ownership of the gun and the place of purchase, as evidence tainted by the prior *Miranda* violation. The Appellate Division of the Supreme Court of New York affirmed without opinion. 85 App. Div. 2d 936, 447 N. Y. S. 2d 84 (1981).

The Court of Appeals granted leave to appeal and affirmed by a 4–3 vote. 58 N. Y. 2d 664, 444 N. E. 2d 984 (1982). It concluded that respondent was in "custody" within the meaning of *Miranda* during all questioning and rejected the State's argument that the exigencies of the situation justified Officer Kraft's failure to read respondent his *Miranda* rights until after he had located the gun. The court declined to recognize an exigency exception to the usual requirements of *Miranda* because it found no indication from Officer Kraft's testimony at the suppression hearing that his subjective motivation in asking the question was to protect his own safety or the safety of the public. 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985. For the reasons which follow, we believe that this case presents a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*.[3]

---

[3] We have long recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context. See, *e. g.*, *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978); *Warden* v. *Hayden*, 387 U. S. 294, 298–300 (1967); *Johnson* v. *United States*, 333 U. S. 10, 14–15 (1948). We have found the warrant requirement of the Fourth Amendment inapplicable in cases where the " 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey* v. *Arizona*, 437 U. S. 385, 394 (1978), quoting *McDonald* v. *United States*, 335 U. S. 451, 456 (1948). Although "the Fifth Amendment's strictures, unlike the Fourth's, are not removed by showing reasonableness," *Fisher* v. *United States*, 425 U. S. 391, 400 (1976), we conclude today that there are limited circumstances where the judicially imposed strictures of *Miranda* are inapplicable.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda* this Court for the first time extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police. 384 U. S., at 460–461, 467. The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially *coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States* v. *Washington,* 431 U. S. 181, 187 (1977) (emphasis added). The *Miranda* Court, however, presumed that interrogation in certain custodial circumstances[4] is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights. The prophylactic *Miranda* warnings therefore are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974); see *Edwards* v. *Arizona,* 451 U. S. 477, 492 (1981) (POWELL, J., concurring). Requiring *Miranda* warnings before custodial interrogation provides "practical reinforcement" for the Fifth Amendment right. *Michigan* v. *Tucker, supra,* at 444.

In this case we have before us no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist. See *Beckwith* v. *United States,* 425 U. S. 341, 347–348 (1976); *Davis* v. *North Carolina,* 384 U. S. 737 (1966). Thus the only issue before us is whether

---

[4]*Miranda* on its facts applies to station house questioning, but we have not so limited it in our subsequent cases, often over strong dissent. See, *e. g., Rhode Island* v. *Innis,* 446 U. S. 291 (1980) (police car); *Orozco* v. *Texas,* 394 U. S. 324 (1969) (defendant's bedroom); *Mathis* v. *United States,* 391 U. S. 1 (1968) (prison cell during defendant's sentence for an unrelated offense); but see *Orozco* v. *Texas, supra,* at 328–331 (WHITE, J., dissenting).

Officer Kraft was justified in failing to make available to respondent the procedural safeguards associated with the privilege against compulsory self-incrimination since *Miranda.*[5]

The New York Court of Appeals was undoubtedly correct in deciding that the facts of this case come within the ambit of the *Miranda* decision as we have subsequently interpreted it. We agree that respondent was in police custody because we have noted that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest," *California* v. *Beheler,* 463 U. S. 1121, 1125 (1983) *(per curiam),* quoting *Oregon* v. *Mathiason,* 429 U. S. 492, 495 (1977) *(per curiam).* Here Quarles was surrounded by at least four police officers and was handcuffed when the questioning at issue took place. As the New York Court of Appeals observed, there was nothing to suggest that any of the officers were any longer concerned for their own physical safety. 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985. The New York Court of Appeals' majority declined to express an opinion as to whether there might be an exception to the *Miranda* rule if the police had been acting to protect the public, because the lower courts in New York had made no factual determination that the police had acted with that motive. *Ibid.*

We hold that on these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence,

---

[5] The dissent curiously takes us to task for "endors[ing] the introduction of coerced self-incriminating statements in criminal prosecutions," *post,* at 674, and for "sanction[ing] *sub silentio* criminal prosecutions based on compelled self-incriminating statements." *Post,* at 686. Of course our decision today does nothing of the kind. As the *Miranda* Court itself recognized, the failure to provide *Miranda* warnings in and of itself does not render a confession involuntary, *Miranda* v. *Arizona,* 384 U. S., at 457, and respondent is certainly free on remand to argue that his statement was coerced under traditional due process standards. Today we merely reject the only argument that respondent has raised to support the exclusion of his statement, that the statement must be *presumed* compelled because of Officer Kraft's failure to read him his *Miranda* warnings.

and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer.[6] Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. The *Miranda* decision was based in large part on this Court's view that the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation in the presumptively coercive environment of the station house. 384 U. S., at 455–458. The dissenters warned that the requirement of *Miranda* warnings would have the effect of decreasing the number of suspects who respond to police questioning. *Id.*, at 504, 516–517 (Harlan, J., joined by Stewart and WHITE, JJ., dissenting). The *Miranda* majority, however, apparently felt that whatever the

---

[6] Similar approaches have been rejected in other contexts. See *Rhode Island* v. *Innis*, *supra*, at 301 (officer's subjective intent to incriminate not determinative of whether "interrogation" occurred); *United States* v. *Mendenhall*, 446 U. S. 544, 554, and n. 6 (1980) (opinion of Stewart, J.) (officer's subjective intent to detain not determinative of whether a "seizure" occurred within the meaning of the Fourth Amendment); *United States* v. *Robinson*, 414 U. S. 218, 236, and n. 7 (1973) (officer's subjective fear not determinative of necessity for "search incident to arrest" exception to the Fourth Amendment warrant requirement).

cost to society in terms of fewer convictions of guilty suspects, that cost would simply have to be borne in the interest of enlarged protection for the Fifth Amendment privilege.

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever proba-

tive evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibilty of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.[7]

In recognizing a narrow exception to the *Miranda* rule in this case, we acknowledge that to some degree we lessen the desirable clarity of that rule. At least in part in order to preserve its clarity, we have over the years refused to sanction attempts to expand our *Miranda* holding. See, *e. g.*, *Minnesota* v. *Murphy*, 465 U. S. 420 (1984) (refusal to extend *Miranda* requirements to interviews with probation officers); *Fare* v. *Michael C.*, 442 U. S. 707 (1979) (refusal to equate request to see a probation officer with request to see a lawyer for *Miranda* purposes); *Beckwith* v. *United States*, 425 U. S. 341 (1976) (refusal to extend *Miranda* requirements to questioning in noncustodial circumstances). As we have in other contexts, we recognize here the importance of a workable rule "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway* v. *New York*, 442 U. S. 200, 213–214 (1979). But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost in-

---

[7] The dissent argues that a public safety exception to *Miranda* is unnecessary because in every case an officer can simply ask the necessary questions to protect himself or the public, and then the prosecution can decline to introduce any incriminating responses at a subsequent trial. *Post*, at 686. But absent actual coercion by the officer, there is no constitutional imperative requiring the exclusion of the evidence that results from police inquiry of this kind; and we do not believe that the doctrinal underpinnings of *Miranda* require us to exclude the evidence, thus penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public.

stinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

The facts of this case clearly demonstrate that distinction and an officer's ability to recognize it. Officer Kraft asked only the question necessary to locate the missing gun before advising respondent of his rights. It was only after securing the loaded revolver and giving the warnings that he continued with investigatory questions about the ownership and place of purchase of the gun. The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.[8]

We hold that the Court of Appeals in this case erred in excluding the statement, "the gun is over there," and the gun because of the officer's failure to read respondent his *Miranda* rights before attempting to locate the weapon. Ac-

---

[8] Although it involves police questions in part relating to the whereabouts of a gun, *Orozco* v. *Texas*, 394 U. S. 324 (1969), is in no sense inconsistent with our disposition of this case. In *Orozco* four hours after a murder had been committed at a restaurant, four police officers entered the defendant's boardinghouse and awakened the defendant, who was sleeping in his bedroom. Without giving him *Miranda* warnings, they began vigorously to interrogate him about whether he had been present at the scene of the shooting and whether he owned a gun. The defendant eventually admitted that he had been present at the scene and directed the officers to a washing machine in the backroom of the boardinghouse where he had hidden the gun. We held that all the statements should have been suppressed. In *Orozco*, however, the questions about the gun were clearly investigatory; they did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon. In short there was no exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime.

*Rhode Island* v. *Innis*, 446 U. S. 291 (1980), also involved the whereabouts of a missing weapon, but our holding in that case depended entirely on our conclusion that no police interrogation took place so as to require consideration of the applicability of the *Miranda* prophylactic.

cordingly we hold that it also erred in excluding the subsequent statements as illegal fruits of a *Miranda* violation.[9] We therefore reverse and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment in part and dissenting in part.

In *Miranda* v. *Arizona,* 384 U. S. 436 (1966), the Court held unconstitutional, because inherently compelled, the admission of statements derived from in-custody questioning not preceded by an explanation of the privilege against self-incrimination and the consequences of forgoing it. Today, the Court concludes that overriding considerations of public safety justify the admission of evidence—oral statements and a gun—secured without the benefit of such warnings. *Ante,* at 657–658. In so holding, the Court acknowledges that it is departing from prior precedent, see *ante,* at 653, and that it is "lessen[ing] the desirable clarity of [the *Miranda*] rule," *ante,* at 658. Were the Court writing from a clean slate, I could agree with its holding. But *Miranda* is now the law and, in my view, the Court has not provided sufficient justification for departing from it or for blurring its now clear strictures. Accordingly, I would require suppression of the initial statement taken from respondent in this case. On the other hand, nothing in *Miranda* or the privilege itself requires exclusion of nontestimonial evidence derived from informal custodial interrogation, and I therefore agree with the Court that admission of the gun in evidence is proper.[1]

---

[9] Because we hold that there is no violation of *Miranda* in this case, we have no occasion to reach arguments made by the State and the United States as *amicus curiae* that the gun is admissible either because it is nontestimonial or because the police would inevitably have discovered it absent their questioning.

[1] As to the statements elicited after the *Miranda* warnings were administered, admission should turn solely on whether the answers received were voluntary. See *Miranda* v. *Arizona,* 384 U. S. 436, 475 (1966). In this

## I

Prior to *Miranda*, the privilege against self-incrimination had not been applied to an accused's statements secured during custodial police interrogation. In these circumstances, the issue of admissibility turned, not on whether the accused had waived his privilege against self-incrimination, but on whether his statements were "voluntary" within the meaning of the Due Process Clause. See, *e. g.*, *Haynes* v. *Washington*, 373 U. S. 503 (1963); *Payne* v. *Arkansas*, 356 U. S. 560 (1958); *Chambers* v. *Florida*, 309 U. S. 227 (1940); *Brown* v. *Mississippi*, 297 U. S. 278 (1936). Under this approach, the "totality of the circumstances" were assessed. If the interrogation was deemed unreasonable or shocking, or if the accused clearly did not have an opportunity to make a rational or intelligent choice, the statements received would be inadmissible.

The *Miranda* Court for the first time made the Self-Incrimination Clause applicable to responses induced by informal custodial police interrogation, thereby requiring suppression of many admissions that, under traditional due process principles, would have been admissible. More specifically, the Court held that

> "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of

---

case, the state courts made no express finding concerning the voluntariness of the statements made, because they thought the answers received had to be suppressed as "fruit" of the initial failure to administer *Miranda* warnings. App. 43a–44a; 58 N. Y. 2d 644, 666, 444 N. E. 2d 984, 985 (1982). Whether the mere failure to administer *Miranda* warnings can "taint" subsequent admissions is an open question, compare *United States* v. *Toral*, 536 F. 2d 893, 896–897 (CA9 1976), with *Oregon* v. *Elstad*, 61 Ore. App. 673, 658 P. 2d 552 (1983), cert. granted, 465 U. S. 1078 (1984), but a proper inquiry must focus at least initially, if not exclusively, on whether the subsequent confession is *itself* free of actual coercion. See *Lyons* v. *Oklahoma*, 322 U. S. 596, 603 (1944). I would reverse and remand for further factual findings on this issue.

procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* v. *Arizona,* 384 U. S., at 444.

Those safeguards included the now familiar *Miranda* warnings—namely, that the defendant must be informed

> "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.,* at 479.

The defendant could waive these rights, but any waiver had to be made "knowingly and intelligently," *id.,* at 475, and the burden was placed on the prosecution to prove that such a waiver had voluntarily been made. *Ibid.* If the *Miranda* warnings were not properly administered or if no valid waiver could be shown, then all responses to interrogation made by the accused "while in custody . . . or otherwise deprived of his freedom of action in any significant way" were to be presumed coerced and excluded from evidence at trial. *Id.,* at 476, 479.

The *Miranda* Court itself considered objections akin to those raised by the Court today. In dissent, JUSTICE WHITE protested that the *Miranda* rules would "operate indiscriminately in all criminal cases, regardless of the severity of the crime or the circumstances involved." *Id.,* at 544. But the *Miranda* Court would not accept any suggestion that "society's need for interrogation [could] outweig[h] the privilege." To that Court, the privilege against self-incrimination was absolute and therefore could not be "abridged." *Id.,* at 479.

Since the time *Miranda* was decided, the Court has repeatedly refused to bend the literal terms of that decision. To be sure, the Court has been sensitive to the substantial burden

the *Miranda* rules place on local law enforcement efforts, and consequently has refused to extend the decision or to increase its strictures on law enforcement agencies in almost any way. See, *e. g.*, *California* v. *Beheler*, 463 U. S. 1121 (1983) *(per curiam); Oregon* v. *Mathiason*, 429 U. S. 492 (1977); *Beckwith* v. *United States*, 425 U. S. 341 (1976); *Michigan* v. *Mosley*, 423 U. S. 96 (1975); but cf. *Edwards* v. *Arizona*, 451 U. S. 477 (1981). Similarly, where "statements taken in violation of the *Miranda* principles [have] not be[en] used to prove the prosecution's case at trial," the Court has allowed evidence derived from those statements to be admitted. *Michigan* v. *Tucker*, 417 U. S. 433, 445 (1974). But wherever an accused has been taken into "custody" and subjected to "interrogation" without warnings, the Court has consistently prohibited the use of his responses for prosecutorial purposes at trial. See, *e. g.*, *Estelle* v. *Smith*, 451 U. S. 454 (1981); *Orozco* v. *Texas*, 394 U. S. 324 (1969); *Mathis* v. *United States*, 391 U. S. 1 (1968); cf. *Harris* v. *New York*, 401 U. S. 222 (1971) (statements may be used for impeachment purposes). As a consequence, the "meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures." *Rhode Island* v. *Innis*, 446 U. S. 291, 304 (1980) (BURGER, C. J., concurring); see generally Stephens, Flanders, & Cannon, Law Enforcement and the Supreme Court: Police Perceptions of the *Miranda* Requirements, 39 Tenn. L. Rev. 407 (1972).

In my view, a "public safety" exception unnecessarily blurs the edges of the clear line heretofore established and makes *Miranda*'s requirements more difficult to understand. In some cases, police will benefit because a reviewing court will find that an exigency excused their failure to administer the required warnings. But in other cases, police will suffer because, though they thought an exigency excused their noncompliance, a reviewing court will view the "objective" circumstances differently and require exclusion of admissions thereby obtained. The end result will be a finespun new

doctrine on public safety exigencies incident to custodial interrogation, complete with the hair-splitting distinctions that currently plague our Fourth Amendment jurisprudence. "While the rigidity of the prophylactic rules was a principal weakness in the view of dissenters and critics outside the Court, . . . that rigidity [has also been called a] strength of the decision. It [has] afforded police and courts clear guidance on the manner in which to conduct a custodial investigation: if it was rigid, it was also precise. . . . [T]his core virtue of *Miranda* would be eviscerated if the prophylactic rules were freely [ignored] by . . . courts under the guise of [reinterpreting] *Miranda . . . .*" *Fare* v. *Michael C.*, 439 U. S. 1310, 1314 (1978) (REHNQUIST, J., in chambers on application for stay).

The justification the Court provides for upsetting the equilibrium that has finally been achieved—that police cannot and should not balance considerations of public safety against the individual's interest in avoiding compulsory testimonial self-incrimination—really misses the critical question to be decided. See *ante*, at 657–658. *Miranda* has never been read to prohibit the police from asking questions to secure the public safety. Rather, the critical question *Miranda* addresses is who shall bear the cost of securing the public safety when such questions are asked and answered: the defendant or the State. *Miranda*, for better or worse, found the resolution of that question implicit in the prohibition against compulsory self-incrimination and placed the burden on the State. When police ask custodial questions without administering the required warnings, *Miranda* quite clearly requires that the answers received be presumed compelled and that they be excluded from evidence at trial. See *Michigan* v. *Tucker, supra*, at 445, 447–448, 451, 452, and n. 26; *Orozco* v. *Texas, supra*, at 326.

The Court concedes, as it must, both that respondent was in "custody" and subject to "interrogation" and that his statement "the gun is over there" was compelled within the meaning of our precedent. See *ante*, at 654–655. In my view,

since there is nothing about an exigency that makes custodial interrogation any less compelling, a principled application of *Miranda* requires that respondent's statement be suppressed.

## II

The court below assumed, without discussion, that the privilege against self-incrimination required that the gun derived from respondent's statement also be suppressed, whether or not the State could independently link it to him.[2] That conclusion was, in my view, incorrect.

## A

Citizens in our society have a deeply rooted social obligation "to give whatever information they may have to aid in law enforcement." *Miranda* v. *Arizona*, 384 U. S., at 478.

---

[2] Respondent contends that the separate admissibility of the gun is not preserved for our review. Brief for Respondent 45–51. This contention is meritless. Respondent's motion to suppress and supporting affidavit asked that the gun be excluded because it was obtained in contravention of his privilege under the Fifth Amendment. See App. 5a, 7a–8a. The State clearly opposed this motion, contending that admission of the statements and the gun would not violate respondent's rights under the Constitution. *Id.*, at 9a. Both the Supreme Court of the State of New York and the New York Court of Appeals required the gun, as well as the statements, to be suppressed because respondent was not given the warnings to which they thought he was constitutionally entitled. *Id.*, at 43a (Supreme Court); 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985 (Court of Appeals). The issue whether the failure to administer warnings by itself constitutionally requires exclusion of the gun was therefore clearly contested, passed on, and preserved for this Court's review. See *Illinois* v. *Gates*, 462 U. S. 213, 217–224 (1983).

Respondent also contends that, under New York law, there is an "independent and adequate state ground" on which the Court of Appeals' judgment can rest. Brief for Respondent 51–55. This may be true, but it is also irrelevant. Both the trial and appellate courts of New York relied on *Miranda* to justify exclusion of the gun; they did not cite or expressly rely on any independent state ground in their decisions. In these circumstances, this Court has jurisdiction. See *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983).

Except where a recognized exception applies, "the criminal defendant no less than any other citizen is obliged to assist the authorities." *Roberts* v. *United States,* 445 U. S. 552, 558 (1980). The privilege against compulsory self-incrimination is one recognized exception, but it is an exception nonetheless. Only the introduction of a defendant's own *testimony* is proscribed by the Fifth Amendment's mandate that no person "shall be compelled in any criminal case to be a witness against himself." That mandate does not protect an accused from being compelled to surrender *nontestimonial* evidence against himself. See *Fisher* v. *United States,* 425 U. S. 391, 408 (1976).

The distinction between testimonial and nontestimonial evidence was explored in some detail in *Schmerber* v. *California,* 384 U. S. 757 (1966), a decision this Court handed down a week after deciding *Miranda.* The defendant in *Schmerber* had argued that the privilege against self-incrimination barred the State from compelling him to submit to a blood test, the results of which would be used to prove his guilt at trial. The State, on the other hand, had urged that the privilege prohibited it only from compelling the accused to make a formal testimonial statement against himself in an official legal proceeding. This Court rejected both positions. It favored an approach that protected the "accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." 384 U. S., at 761. The blood tests were admissible because they were neither testimonial nor communicative in nature. *Id.,* at 765.

In subsequent decisions, the Court relied on *Schmerber* in holding the privilege inapplicable to situations where the accused was compelled to stand in a lineup and utter words that allegedly had been spoken by the robber, see *United States* v. *Wade,* 388 U. S. 218, 221–223 (1967), to provide handwriting samples, see *Gilbert* v. *California,* 388 U. S. 263, 265–266 (1967), and to supply voice exemplars. See *United States* v. *Dionisio,* 410 U. S. 1, 5–7 (1973); see also *United States* v.

*Mara,* 410 U. S. 19, 21–22 (1973). "The distinction which . . . emerged [in these cases], often expressed in different ways, [was] that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Schmerber* v. *California, supra,* at 764.

## B

The gun respondent was compelled to supply is clearly evidence of the "real or physical" sort. What makes the question of its admissibility difficult is the fact that, in asking respondent to produce the gun, the police also "compelled" him, in the *Miranda* sense, to create an incriminating testimonial response. In other words, the case is problematic because police compelled respondent not only to provide the gun but also to admit that he knew where it was and that it was his.

It is settled that *Miranda* did not itself determine whether physical evidence obtained in this manner would be admissible. See *Michigan* v. *Tucker,* 417 U. S., at 445–446, 447, 452, and n. 26. But the Court in *Schmerber,* with *Miranda* fresh on its mind, did address the issue. In concluding that the privilege did not require suppression of compelled blood tests, the Court noted:

> "This conclusion would not necessarily govern had the State tried to show that the accused had incriminated himself when told that he would have to be tested. Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it wishes to compel persons to submit to such attempts to discover evidence, the State may have to forgo the advantage of any *testimonial* products of administering the test—products which would fall within the privilege." 384 U. S., at 765, and n. 9 (emphasis in original).

Thus, *Schmerber* resolved the dilemma by allowing admission of the nontestimonial, but not the testimonial, products of the State's compulsion.

The Court has applied this bifurcated approach in its subsequent cases as well. For example, in *United States* v. *Wade*, 388 U. S. 218, 223 (1967), where admission of a lineup identification was approved, the Court emphasized that no question was presented as to the admissibility of anything said or done at the lineup. Likewise, in *Michigan* v. *Tucker*, where evidence derived from a technical *Miranda* violation was admitted, the Court noted that no statement taken without *Miranda* warnings was being admitted into evidence. See 417 U. S., at 445; cf. *California* v. *Byers*, 402 U. S. 424, 431–433 (1971) (opinion of BURGER, C. J.). Thus, based on the distinction first articulated in *Schmerber*, "a strong analytical argument can be made for an intermediate rule whereby[,] although [the police] cannot require the suspect to speak by punishment or force, the nontestimonial [evidence derived from] speech that is [itself] excludable for failure to comply with the *Miranda* code could still be used." H. Friendly, Benchmarks 280 (1967).

To be sure, admission of nontestimonial evidence secured through informal custodial interrogation will reduce the incentives to enforce the *Miranda* code. But that fact simply begs the question of *how much* enforcement is appropriate. There are some situations, as the Court's struggle to accommodate a "public safety" exception demonstrates, in which the societal cost of administering the *Miranda* warnings is very high indeed.[3] The *Miranda* decision quite practically does not express any societal interest in having those warn-

---

[3] The most obvious example, first suggested by Judge Henry Friendly, involves interrogation directed to the discovery and termination of an ongoing criminal activity such as kidnaping or extortion. See Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 949 (1965).

ings administered for their own sake. Rather, the warnings and waiver are only required to ensure that "testimony" used against the accused at trial is voluntarily given. Therefore, if the testimonial aspects of the accused's custodial communications are suppressed, the failure to administer the *Miranda* warnings should cease to be of concern. Cf. *Weatherford* v. *Bursey*, 429 U. S. 545 (1977) (where interference with assistance of counsel has no effect on trial, no Sixth Amendment violation lies). The harm caused by failure to administer *Miranda* warnings relates only to admission of testimonial self-incriminations, and the suppression of such incriminations should by itself produce the optimal enforcement of the *Miranda* rule.

## C

There are, of course, decisions of this Court which suggest that the privilege against self-incrimination requires suppression not only of compelled statements but also of all evidence derived therefrom. See, *e. g., Maness* v. *Meyers*, 419 U. S. 449 (1975); *Kastigar* v. *United States*, 406 U. S. 441 (1972); *McCarthy* v. *Arndstein*, 266 U. S. 34 (1924); *Counselman* v. *Hitchcock*, 142 U. S. 547 (1892). In each of these cases, however, the Court was responding to the dilemma that confronts persons asserting their Fifth Amendment privilege to a court or other tribunal vested with the contempt power. In each instance, the tribunal can require witnesses to appear without any showing of probable cause to believe they have committed an offense or that they have relevant information to convey, and require the witnesses to testify even if they have formally and expressly asserted a privilege of silence. Individuals in this situation are faced with what Justice Goldberg once described as "the cruel trilemma of self-accusation, perjury, or contempt." *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 55 (1964). If the witness' invocation of the privilege at trial is not to be defeated by the State's refusal to let him remain silent at an earlier proceeding, the witness has to

be protected "against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case. . . ." *Lefkowitz* v. *Turley,* 414 U. S. 70, 78 (1973).

By contrast, suspects subject to informal custodial police interrogation of the type involved in this case are not in the same position as witnesses required to appear before a court, grand jury, or other such formal tribunal. Where independent evidence leads police to a suspect, and probable cause justifies his arrest, the suspect cannot seriously urge that the police have somehow unfairly infringed on his right "to a private enclave where he may lead a private life." *Murphy* v. *Waterfront Comm'n, supra,* at 55. Moreover, when a suspect interjects not the privilege itself but a *post hoc* complaint that the police failed to administer *Miranda* warnings, he invokes only an irrebuttable presumption that the interrogation was coercive. He does not show that a privilege was raised and that the police actually or overtly coerced him to provide testimony and other evidence to be used against him at trial. See *Johnson* v. *New Jersey,* 384 U. S. 719, 730 (1966). He could have remained silent and the interrogator could not have punished him for refusing to speak. Indeed, the accused is in the unique position of seeking the protection of the privilege without having timely asserted it. Cf. *United States* v. *Kordel,* 397 U. S. 1, 10 (1970) (failure to assert waives right to complain about testimonial compulsion). The person in police custody surely may sense that he is in "trouble," *Oregon* v. *Hass,* 420 U. S. 714, 722 (1975), but he is in no position to protest that he faced the Hobson's choice of self-accusation, perjury, or contempt. He therefore has a much less sympathetic case for obtaining the benefit of a broad suppression ruling. See *Michigan* v. *Tucker,* 417 U. S., at 444–451; cf. *New Jersey* v. *Portash,* 440 U. S. 450, 458–459 (1979).

Indeed, whatever case can be made for suppression evaporates when the statements themselves are not admitted, given the rationale of the *Schmerber* line of cases. Certainly

interrogation which provides leads to other evidence does not offend the values underlying the Fifth Amendment privilege any more than the compulsory taking of blood samples, fingerprints, or voice exemplars, all of which may be compelled in an "attempt to discover evidence that might be used to prosecute [a defendant] for a criminal offense." *Schmerber* v. *California*, 384 U. S., at 761. Use of a suspect's answers "merely to find other evidence establishing his connection with the crime [simply] differs only by a shade from the permitted use for that purpose of his body or his blood." H. Friendly, Benchmarks 280 (1967). The values underlying the privilege may justify exclusion of an unwarned person's out-of-court statements, as perhaps they may justify exclusion of statements and derivative evidence compelled under the threat of contempt. But when the only evidence to be admitted is derivative evidence such as a gun—derived not from actual compulsion but from a statement taken in the absence of *Miranda* warnings—those values simply cannot require suppression, at least no more so than they would for other such nontestimonial evidence.[4]

---

[4] In suggesting that *Wong Sun* v. *United States*, 371 U. S. 471 (1963), requires exclusion of the gun, see *post*, at 688–689, JUSTICE MARSHALL fails to acknowledge this Court's holding in *Michigan* v. *Tucker*, 417 U. S. 433, 445–446 (1974). In *Tucker*, the Court very clearly held that *Wong Sun* is inapplicable in cases involving mere departures from *Miranda*. *Wong Sun* and its "fruit of the poisonous tree" analysis lead to exclusion of derivative evidence only where the underlying police misconduct infringes a "core" constitutional right. See 417 U. S., at 445–446. Failure to administer *Miranda* warnings violates only a nonconstitutional prophylactic. *Ibid.*

*Nix* v. *Williams, ante,* p. 431, is not to the contrary. In *Nix,* the Court held that evidence which inevitably would have been discovered need not be excluded at trial because of independent police misconduct. The Court in *Nix* discusses *Wong Sun* and its "fruit of the poisonous tree" analysis only to show that, even assuming a "core" violation of the Fourth, Fifth, or Sixth Amendment, evidence with a separate causal link need not be excluded at trial. Thus, *Nix* concludes that only "where 'the subse-

On the other hand, if a suspect is subject to abusive police practices and actually or overtly compelled to speak, it is reasonable to infer both an unwillingness to speak and a perceptible assertion of the privilege.  See *Mincey* v. *Arizona,* 437 U. S. 385, 396–402 (1978).  Thus, when the *Miranda* violation consists of a deliberate and flagrant abuse of the accused's constitutional rights, amounting to a denial of due process, application of a broader exclusionary rule is warranted.  Of course, "a defendant raising [such] a coerced-confession claim . . . must first prevail in a voluntariness hearing before his confession and evidence derived from it [will] become inadmissible." *Kastigar* v. *United States,* 406 U. S., at 462.  By contrast, where the accused proves only that the police failed to administer the *Miranda* warnings, exclusion of the statement itself is all that will and should be required.[5]  Limitation of the *Miranda* prohibition to testimonial use of the statements themselves adequately serves the purposes of the privilege against self-incrimination.

### III

In *Miranda,* the Court looked to the experience of countries like England, India, Scotland, and Ceylon in developing its code to regulate custodial interrogations.  See *Miranda*

---

quent trial [cannot] cure a[n otherwise] one-sided confrontation between prosecuting authorities and the uncounseled defendant,'" *ante,* at 447 (quoting from *United States* v. *Ash,* 413 U. S. 300, 315 (1973)), should derivative evidence be excluded.  Cf. *Brewer* v. *Williams,* 430 U. S. 387, 406–407, and n. 12 (1977) (leaving open question whether any evidence beyond the incriminating statements themselves must be excluded); *Massiah* v. *United States,* 377 U. S. 201, 207 (1964) (same).

[5] Respondent has not previously contended that his confession was so blatantly coerced as to constitute a violation of due process.  He has argued only that police failed to administer *Miranda* warnings.  He has proved, therefore, only that his statement was *presumptively* compelled.  In any event, that is a question for the trial court on remand to decide in the first instance, not for this Court to decide on certiorari review.

v. *Arizona*, 384 U. S., at 486–489.  Those countries had also adopted procedural rules to regulate the manner in which police secured confessions to be used against accused persons at trial.  See Note, Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 1090–1114 (1966).  Confessions induced by trickery or physical abuse were never admissible at trial, and any confession secured without the required procedural safeguards could, in the courts' discretion, be excluded on grounds of fairness or prejudice.  See Gotlieb, Confirmation by Subsequent Facts, 72 L. Q. Rev. 209, 223–224 (1956).  But nontestimonial evidence derived from all confessions "not blatantly coerced" was and still is admitted.  Friendly, *supra*, at 282; see also *Commissioners of Customs and Excise* v. *Harz*, 1 All E. R. 177, 182 (1967); *King* v. *Warickshall*, 1 Leach 262, 168 Eng. Rep. 234 (K. B. 1783).  Admission of nontestimonial evidence of this type is based on the very sensible view that procedural errors should not cause entire investigations and prosecutions to be lost.  See Enker & Elsen, Counsel For the Suspect: *Massiah* v. *United States* and *Escobedo* v. *Illinois*, 49 Minn. L. Rev. 47, 80 (1964).

The learning of these countries was important to development of the initial *Miranda* rule.  It therefore should be of equal importance in establishing the scope of the *Miranda* exclusionary rule today.[6]  I would apply that learning in this case and adhere to our precedents requiring that statements elicited in the absence of *Miranda* warnings be suppressed.  But because nontestimonial evidence such as the gun should not be suppressed, I join in that part of the Court's judgment

---

[6] Interestingly, the trend in these other countries is to admit the improperly obtained statements themselves, if nontestimonial evidence later corroborates, in whole or in part, the admission.  See Note, Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 1094–1095, 1100, 1104, 1108–1109 (1966); see also *Queen* v. *Ramasamy*, [1965] A. C. 1, 12–15 (P. C.).

that reverses and remands for further proceedings with the gun admissible as evidence against the accused.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

The police in this case arrested a man suspected of possessing a firearm in violation of New York law. Once the suspect was in custody and found to be unarmed, the arresting officer initiated an interrogation. Without being advised of his right not to respond, the suspect incriminated himself by locating the gun. The majority concludes that the State may rely on this incriminating statement to convict the suspect of possessing a weapon. I disagree. The arresting officers had no legitimate reason to interrogate the suspect without advising him of his rights to remain silent and to obtain assistance of counsel. By finding on these facts justification for unconsented interrogation, the majority abandons the clear guidelines enunciated in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and condemns the American judiciary to a new era of *post hoc* inquiry into the propriety of custodial interrogations. More significantly and in direct conflict with this Court's longstanding interpretation of the Fifth Amendment, the majority has endorsed the introduction of coerced self-incriminating statements in criminal prosecutions. I dissent.

I

Shortly after midnight on September 11, 1980, Officer Kraft and three other policemen entered an A & P supermarket in search of respondent Quarles, a rape suspect who was reportedly armed. After a brief chase, the officers cornered Quarles in the back of the store. As the other officers trained their guns on the suspect, Officer Kraft frisked Quarles and discovered an empty shoulder holster. Officer Kraft then handcuffed Quarles, and the other officers holstered their guns. With Quarles' hands manacled behind

his back and the other officers standing close by, Officer Kraft questioned Quarles: "Where is the gun?" Gesturing towards a stack of liquid-soap cartons a few feet away, Quarles responded: "The gun is over there." Behind the cartons, the police found a loaded revolver. The State of New York subsequently failed to prosecute the alleged rape, and charged Quarles on a solitary count of criminal possession of a weapon in the third degree.[1] As proof of the critical element of the offense, the State sought to introduce Quarles' response to Officer Kraft's question as well as the revolver found behind the cartons. The Criminal Term of the Supreme Court of the State of New York ordered both Quarles' statement and the gun suppressed. The suppression order was affirmed first by the Appellate Division, 85 App. Div. 2d 936, 447 N. Y. S. 2d 84 (1981), and again by the New York Court of Appeals, 58 N. Y. 2d 664, 444 N. E. 2d 984 (1982) (mem.).

The majority's entire analysis rests on the factual assumption that the public was at risk during Quarles' interrogation. This assumption is completely in conflict with the facts as found by New York's highest court. Before the interrogation began, Quarles had been "reduced to a condition of physical powerlessness." *Id.*, at 667, 444 N. E. 2d, at 986. Contrary to the majority's speculations, *ante*, at 657, Quarles was not believed to have, nor did he in fact have, an accomplice to come to his rescue. When the questioning began, the arresting officers were sufficiently confident of their safety to put away their guns. As Officer Kraft acknowledged at the suppression hearing, "the situation was under control." App. 35a. Based on Officer Kraft's own testimony, the New York Court of Appeals found: "Nothing

---

[1] Under New York law, any person who possesses a loaded firearm outside of his home or place of business is guilty of criminal possession of a weapon in the third degree. N. Y. Penal Law § 265.02(4) (McKinney 1980).

suggests that any of the officers was by that time concerned for his own physical safety." 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985. The Court of Appeals also determined that there was no evidence that the interrogation was prompted by the arresting officers' concern for the public's safety. *Ibid.*

The majority attempts to slip away from these unambiguous findings of New York's highest court by proposing that danger be measured by objective facts rather than the subjective intentions of arresting officers. *Ante,* at 655–656. Though clever, this ploy was anticipated by the New York Court of Appeals: "[T]here is no evidence in the record before us that there were exigent circumstances posing a risk to the public safety . . . ." 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985.

The New York court's conclusion that neither Quarles nor his missing gun posed a threat to the public's safety is amply supported by the evidence presented at the suppression hearing. Again contrary to the majority's intimations, *ante,* at 657, no customers or employees were wandering about the store in danger of coming across Quarles' discarded weapon. Although the supermarket was open to the public, Quarles' arrest took place during the middle of the night when the store was apparently deserted except for the clerks at the check-out counter. The police could easily have cordoned off the store and searched for the missing gun. Had they done so, they would have found the gun forthwith. The police were well aware that Quarles had discarded his weapon somewhere near the scene of the arrest. As the State acknowledged before the New York Court of Appeals: "After Officer Kraft had handcuffed and frisked the defendant in the supermarket, *he knew with a high degree of certainty that the defendant's gun was within the immediate vicinity of the encounter.* He undoubtedly would have searched for it in the carton a few feet away without the defendant having looked in that direction and saying that it was there." Brief for Appellant in No. 2512/80 (N. Y. Ct. App.), p. 11 (emphasis added).

Earlier this Term, four Members of the majority joined an opinion stating: "[Q]uestions of historical fact . . . must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts." *Rushen* v. *Spain*, 464 U. S. 114, 120 (1983) *(per curiam).* In this case, there was convincing, indeed almost overwhelming, evidence to support the New York court's conclusion that Quarles' hidden weapon did not pose a risk either to the arresting officers or to the public. The majority ignores this evidence and sets aside the factual findings of the New York Court of Appeals. More cynical observers might well conclude that a state court's findings of fact "deserv[e] a 'high measure of deference,'" *ibid.* (quoting *Sumner* v. *Mata*, 455 U. S. 591, 598 (1982)), only when deference works against the interests of a criminal defendant.

## II

The majority's treatment of the legal issues presented in this case is no less troubling than its abuse of the facts. Before today's opinion, the Court had twice concluded that, under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), police officers conducting custodial interrogations must advise suspects of their rights before any questions concerning the whereabouts of incriminating weapons can be asked. *Rhode Island* v. *Innis,* 446 U. S. 291, 298–302 (1980) (dicta); *Orozco* v. *Texas,* 394 U. S. 324 (1969) (holding).[2] Now the majority departs from these cases and rules that police may withhold

---

[2] The majority attempts to distinguish *Orozco* by stressing the fact that the interrogation in this case immediately followed Quarles' arrest whereas the interrogation in *Orozco* occurred some four hours after the crime and was investigatory. *Ante,* at 655, n. 5. I fail to comprehend the distinction. In both cases, a group of police officers had taken a suspect into custody and questioned the suspect about the location of a missing gun. In both cases a dangerous weapon was missing, and in neither case was there any direct evidence where the weapon was hidden.

*Miranda* warnings whenever custodial interrogations concern matters of public safety.[3]

The majority contends that the law, as it currently stands, places police officers in a dilemma whenever they interrogate a suspect who appears to know of some threat to the public's safety. *Ante,* at 657. If the police interrogate the suspect without advising him of his rights, the suspect may reveal information that the authorities can use to defuse the threat, but the suspect's statements will be inadmissible at trial. If, on the other hand, the police advise the suspect of his rights, the suspect may be deterred from responding to the police's questions, and the risk to the public may continue unabated. According to the majority, the police must now choose between establishing the suspect's guilt and safeguarding the public from danger.

The majority proposes to eliminate this dilemma by creating an exception to *Miranda* v. *Arizona* for custodial interrogations concerning matters of public safety. *Ante,* at 658–659. Under the majority's exception, police would be permitted to interrogate suspects about such matters before the suspects have been advised of their constitutional rights. Without being "deterred" by the knowledge that they have a constitutional right not to respond, these suspects will be likely to answer the questions. Should the answers also be incriminating, the State would be free to introduce them as evidence in a criminal prosecution. Through this "narrow exception to the *Miranda* rule," *ante,* at 658, the majority proposes to protect the public's safety without jeopardizing the prosecution of criminal defendants. I find in this reasoning an unwise and unprincipled departure from our Fifth Amendment precedents.

---

[3] Although the majority stresses the exigencies of Quarles' arrest, it is undisputed that Quarles was in custody when Officer Kraft's questioning began, *ante,* at 655, and there is nothing in the majority's rationale—save the instincts of police officers—to prevent it from applying to all custodial interrogations.

Before today's opinion, the procedures established in *Miranda* v. *Arizona* had "the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible." *Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979); see *Harryman* v. *Estelle*, 616 F. 2d 870, 873–874 (CA5 1980) (en banc), cert. denied, 449 U. S. 860 (1980). In a chimerical quest for public safety, the majority has abandoned the rule that brought 18 years of doctrinal tranquility to the field of custodial interrogations. As the majority candidly concedes, *ante*, at 658, a public-safety exception destroys forever the clarity of *Miranda* for both law enforcement officers and members of the judiciary. The Court's candor cannot mask what a serious loss the administration of justice has incurred.

This case is illustrative of the chaos the "public-safety" exception will unleash. The circumstances of Quarles' arrest have never been in dispute. After the benefit of briefing and oral argument, the New York Court of Appeals, as previously noted, concluded that there was "no evidence in the record before us that there were exigent circumstances posing a risk to the public safety." 58 N. Y. 2d, at 666, 444 N. E. 2d, at 985. Upon reviewing the same facts and hearing the same arguments, a majority of this Court has come to precisely the opposite conclusion: "So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety. . . ." *Ante*, at 657.

If after plenary review two appellate courts so fundamentally differ over the threat to public safety presented by the simple and uncontested facts of this case, one must seriously question how law enforcement officers will respond to the majority's new rule in the confusion and haste of the real world. As THE CHIEF JUSTICE wrote in a similar context: "Few, if any, police officers are competent to make the kind

of evaluation seemingly contemplated . . . ." *Rhode Island* v. *Innis*, 446 U. S., at 304 (concurring in judgment). Not only will police officers have to decide whether the objective facts of an arrest justify an unconsented custodial interrogation, they will also have to remember to interrupt the interrogation and read the suspect his *Miranda* warnings once the focus of the inquiry shifts from protecting the public's safety to ascertaining the suspect's guilt. Disagreements of the scope of the "public-safety" exception and mistakes in its application are inevitable.[4]

The end result, as JUSTICE O'CONNOR predicts, will be "a finespun new doctrine on public safety exigencies incident to custodial interrogation, complete with the hair-splitting distinctions that currently plague our Fourth Amendment jurisprudence." *Ante*, at 663–664. In the meantime, the courts will have to dedicate themselves to spinning this new web of doctrines, and the country's law enforcement agencies will have to suffer patiently through the frustations of another period of constitutional uncertainty.

### III

Though unfortunate, the difficulty of administering the "public-safety" exception is not the most profound flaw in the majority's decision. The majority has lost sight of the fact that *Miranda* v. *Arizona* and our earlier custodial-interrogation cases all implemented a constitutional privilege against self-incrimination. The rules established in these cases were designed to protect criminal defendants against prosecutions based on coerced self-incriminating statements. The majority today turns its back on these constitutional consider-

---

[4] One of the peculiarities of the majority's decision is its suggestion that police officers can "distinguish almost instinctively" questions tied to public safety and questions designed to elicit testimonial evidence. *Ante*, at 658. Obviously, these distinctions are extraordinary difficult to draw. In many cases—like this one—custodial questioning may serve both purposes. It is therefore wishful thinking for the majority to suggest that the intuitions of police officers will render its decision self-executing.

ations, and invites the government to prosecute through the use of what necessarily are coerced statements.

## A

The majority's error stems from a serious misunderstanding of *Miranda* v. *Arizona* and of the Fifth Amendment upon which that decision was based. The majority implies that *Miranda* consisted of no more than a judicial balancing act in which the benefits of "enlarged protection for the Fifth Amendment privilege" were weighed against "the cost to society in terms of fewer convictions of guilty suspects." *Ante,* at 656–657. Supposedly because the scales tipped in favor of the privilege against self-incrimination, the *Miranda* Court erected a prophylactic barrier around statements made during custodial interrogations. The majority now proposes to return to the scales of social utility to calculate whether *Miranda*'s prophylactic rule remains cost-effective when threats to the public's safety are added to the balance. The results of the majority's "test" are announced with pseudo-scientific precision:

> "We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Ante,* at 657.

The majority misreads *Miranda.* Though the *Miranda* dissent prophesized dire consequences, see 384 U. S., at 504, 516–517 (Harlan, J., dissenting), the *Miranda* Court refused to allow such concerns to weaken the protections of the Constitution:

> "A recurrent argument made in these cases is that society's need for interrogation outweighs the privilege. This argument is not unfamiliar to this Court. The whole thrust of our foregoing discussion demonstrates that the Constitution has prescribed the rights of the individual when confronted with the power of government

when it provided in the Fifth Amendment that an individual cannot be compelled to be a witness against himself. That right cannot be abridged." *Id.*, at 479 (citation omitted).

Whether society would be better off if the police warned suspects of their rights before beginning an interrogation or whether the advantages of giving such warnings would outweigh their costs did not inform the *Miranda* decision. On the contrary, the *Miranda* Court was concerned with the proscriptions of the Fifth Amendment, and, in particular, whether the Self-Incrimination Clause permits the government to prosecute individuals based on statements made in the course of custodial interrogations.

*Miranda* v. *Arizona* was the culmination of a century-long inquiry into how this Court should deal with confessions made during custodial interrogations. Long before *Miranda*, the Court had recognized that the Federal Government was prohibited from introducing at criminal trials compelled confessions, including confessions compelled in the course of custodial interrogations. In 1924, Justice Brandeis was reciting settled law when he wrote: "[A] confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." *Wan* v. *United States*, 266 U. S. 1, 14–15 (citing *Bram* v. *United States*, 168 U. S. 532 (1897)).

Prosecutors in state courts were subject to similar constitutional restrictions. Even before *Malloy* v. *Hogan*, 378 U. S. 1 (1964), formally applied the Self-Incrimination Clause of the Fifth Amendment to the States, the Due Process Clause constrained the States from extorting confessions from criminal defendants. *Chambers* v. *Florida*, 309 U. S. 227 (1940); *Brown* v. *Mississippi*, 297 U. S. 278 (1936). Indeed, by the time of *Malloy*, the constraints of the Due Process Clause were almost as stringent as the requirements of the Fifth Amendment itself. 378 U. S., at 6–7; see, *e. g.*, *Haynes* v. *Washington*, 373 U. S. 503 (1963).

When *Miranda* reached this Court, it was undisputed that both the States and the Federal Government were constitutionally prohibited from prosecuting defendants with confessions coerced during custodial interrogations.[5]  As a theoretical matter, the law was clear.  In practice, however, the courts found it exceedingly difficult to determine whether a given confession had been coerced.  Difficulties of proof and subtleties of interrogation technique made it impossible in most cases for the judiciary to decide with confidence whether the defendant had voluntarily confessed his guilt or whether his testimony had been unconstitutionally compelled.  Courts around the country were spending countless hours reviewing the facts of individual custodial interrogations.  See Note, Developments in the Law—Confessions, 79 Harv. L. Rev. 935 (1966).

*Miranda* dealt with these practical problems.  After a detailed examination of police practices and a review of its previous decisions in the area, the Court in *Miranda* determined that custodial interrogations are inherently coercive.  The Court therefore created a constitutional presumption that statements made during custodial interrogations are compelled in violation of the Fifth Amendment and are thus inadmissible in criminal prosecutions.  As a result of the Court's decision in *Miranda*, a statement made during a custodial interrogation may be introduced as proof of a defendant's guilt only if the prosecution demonstrates that the defendant knowingly and intelligently waived his constitutional rights before making the statement.[6]  The

---

[5] There was, of course, still considerable confusion over whether the Sixth Amendment or the Fifth Amendment provided the basis for this prohibition.  See *Escobedo* v. *Illinois*, 378 U. S. 478 (1964).  But the matter was undeniably of constitutional magnitude.

[6] Until today, the Court has consistently adhered to *Miranda*'s holding that, absent informed waiver, statements made during a custodial interrogation cannot be used to prove a defendant's guilt.  Admittedly, in *Harris* v. *New York*, 401 U. S. 222 (1971), the Court permitted such statements to be introduced to impeach a defendant, but their introduction was tolerated only because the jury had been instructed to consider the statements "only

now-familiar *Miranda* warnings offer law enforcement authorities a clear, easily administered device for ensuring that criminal suspects understand their constitutional rights well enough to waive them and to engage in consensual custodial interrogation.

In fashioning its "public-safety" exception to *Miranda*, the majority makes no attempt to deal with the constitutional presumption established by that case. The majority does not argue that police questioning about issues of public safety is any less coercive than custodial interrogations into other matters. The majority's only contention is that police officers could more easily protect the public if *Miranda* did not apply to custodial interrogations concerning the public's safety.[7] But *Miranda* was not a decision about public safety; it was a decision about coerced confessions. Without establishing that interrogations concerning the public's safety are less likely to be coercive than other interrogations, the majority cannot endorse the "public-safety" exception and remain faithful to the logic of *Miranda* v. *Arizona*.

## B

The majority's avoidance of the issue of coercion may not have been inadvertent. It would strain credulity to contend

---

in passing on [the defendant's] credibility and not as evidence of guilt." *Id.*, at 223.

[7] The majority elsewhere attempts to disguise its decision as an effort to cut back on the overbreadth of *Miranda*'s prophylactic standard. *Ante*, at 654–655. The disguise is transparent. Although *Miranda* was overbroad in that its application excludes some statements made during custodial interrogations that are not in fact coercive, the majority is not dealing with a class of cases affected by *Miranda*'s overbreadth. The majority is exempting from *Miranda*'s prophylactic rule incriminating statements that were elicited to safeguard the public's safety. As is discussed below, see *infra*, at 685–686, the majority supports the "public-safety" exception because "public-safety" interrogations can be coercive. In this respect, the Court's decision differs greatly from *Michigan* v. *Tucker*, 417 U. S. 433 (1974), in which the Court sanctioned the admission of the fruits of a *Miranda* violation, but only because the violation was technical and the interrogation itself noncoercive.

that Officer Kraft's questioning of respondent Quarles was not coercive.[8]   In the middle of the night and in the back of an empty supermarket, Quarles was surrounded by four armed police officers.   His hands were handcuffed behind his back.   The first words out of the mouth of the arresting officer were: "Where is the gun?"   In the majority's phrase, the situation was "kaleidoscopic."   *Ante*, at 656.   Police and suspect were acting on instinct.   Officer Kraft's abrupt and pointed question pressured Quarles in precisely the way that the *Miranda* Court feared the custodial interrogations would coerce self-incriminating testimony.

That the application of the "public-safety" exception in this case entailed coercion is no happenstance.   The majority's *ratio decidendi* is that interrogating suspects about matters of public safety *will* be coercive.   In its cost-benefit analysis, the Court's strongest argument in favor of a "public-safety" exception to *Miranda* is that the police would be better able to protect the public's safety if they were not always required to give suspects their *Miranda* warnings.   The crux of this argument is that, by deliberately withholding *Miranda* warnings, the police can get information out of suspects who would refuse to respond to police questioning were they advised of their constitutional rights.   The "public-safety" exception is efficacious precisely because it permits police officers to coerce criminal defendants into making involuntary statements.

Indeed, in the efficacy of the "public-safety" exception lies a fundamental and constitutional defect.   Until today, this Court could truthfully state that the Fifth Amendment is given "broad scope" "[w]here there has been genuine compul-

---

[8] The majority's reliance on respondent's failure to claim that his testimony was compelled by police conduct can only be disingenous.   Before today's opinion, respondent had no need to claim actual compulsion. Heretofore, it was sufficient to demonstrate that the police had conducted nonconsensual custodial interrogation.   But now that the law has changed, it is only fair to examine the facts of the case to determine whether coercion probably was involved.

sion of testimony." *Michigan* v. *Tucker*, 417 U. S. 433, 440 (1974).   Coerced confessions were simply inadmissible in criminal prosecutions.   The "public-safety" exception departs from this principle by expressly inviting police officers to coerce defendants into making incriminating statements, and then permitting prosecutors to introduce those statements at trial.   Though the majority's opinion is cloaked in the beguiling language of utilitarianism, the Court has sanctioned *sub silentio* criminal prosecutions based on compelled self-incriminating statements.   I find this result in direct conflict with the Fifth Amendment's dictate that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."

The irony of the majority's decision is that the public's safety can be perfectly well protected without abridging the Fifth Amendment.   If a bomb is about to explode or the public is otherwise imminently imperiled, the police are free to interrogate suspects without advising them of their constitutional rights.   Such unconsented questioning may take place not only when police officers act on instinct but also when higher faculties lead them to believe that advising a suspect of his constitutional rights might decrease the likelihood that the suspect would reveal life-saving information.   If trickery is necessary to protect the public, then the police may trick a suspect into confessing.   While the Fourteenth Amendment sets limits on such behavior, nothing in the Fifth Amendment or our decision in *Miranda* v. *Arizona* proscribes this sort of emergency questioning.   All the Fifth Amendment forbids is the introduction of coerced statements at trial.   Cf. *Weatherford* v. *Bursey*, 429 U. S. 545 (1977) (Sixth Amendment violated only if trial affected).

To a limited degree, the majority is correct that there is a cost associated with the Fifth Amendment's ban on introducing coerced self-incriminating statements at trial.   Without a "public-safety" exception, there would be occasions when a defendant incriminated himself by revealing a threat to the

public, and the State was unable to prosecute because the defendant retracted his statement after consulting with counsel and the police cannot find independent proof of guilt. Such occasions would not, however, be common. The prosecution does not always lose the use of incriminating information revealed in these situations. After consulting with counsel, a suspect may well volunteer to repeat his statement in hopes of gaining a favorable plea bargain or more lenient sentence. The majority thus overstates its case when it suggests that a police officer must necessarily choose between public safety and admissibility.[9]

But however frequently or infrequently such cases arise, their regularity is irrelevant. The Fifth Amendment prohibits compelled self-incrimination.[10] As the Court has explained on numerous occasions, this prohibition is the mainstay of our adversarial system of criminal justice. Not only does it protect us against the inherent unreliability of compelled testimony, but it also ensures that criminal investigations will be conducted with integrity and that the judiciary will avoid the taint of official lawlessness. See *Murphy*

[9] I also seriously question how often a statement linking a suspect to the threat to the public ends up being the crucial and otherwise unprovable element of a criminal prosecution. The facts of the current case illustrate this point. The police arrested respondent Quarles not because he was suspected of carrying a gun, but because he was alleged to have committed rape. *Ante,* at 651–652. Had the State elected to prosecute on the rape count alone, respondent's incriminating statement about the gun would have had no role in the prosecution. Only because the State dropped the rape count and chose to proceed to trial solely on the criminal-possession charge did respondent's answer to Officer Kraft's question become critical.

[10] In this sense, the Fifth Amendment differs fundamentally from the Fourth Amendment, which only prohibits unreasonable searches and seizures. See *Fisher* v. *United States,* 425 U. S. 391, 400 (1976). Accordingly, the various exceptions to the Fourth Amendment permitting warrantless searches under various circumstances should have no analogy in the Fifth Amendment context. Curiously, the majority accepts this point, see, *ante,* at 652, n. 2, but persists in limiting the protections of the Fifth Amendment.

v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964).   The policies underlying the Fifth Amendment's privilege against self-incrimination are not diminished simply because testimony is compelled to protect the public's safety.   The majority should not be permitted to elude the Amendment's absolute prohibition simply by calculating special costs that arise when the public's safety is at issue.   Indeed, were constitutional adjudication always conducted in such an ad hoc manner, the Bill of Rights would be a most unreliable protector of individual liberties.

## IV

Having determined that the Fifth Amendment renders inadmissible Quarles' response to Officer Kraft's questioning, I have no doubt that our precedents require that the gun discovered as a direct result of Quarles' statement must be presumed inadmissible as well.   The gun was the direct product of a coercive custodial interrogation.   In *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920), and *Wong Sun* v. *United States,* 371 U. S. 471 (1963), this Court held that the Government may not introduce incriminating evidence derived from an illegally obtained source. This Court recently explained the extent of the *Wong Sun* rule:

> "Although *Silverthorne* and *Wong Sun* involved violations of the Fourth Amendment, the 'fruit of the poisonous tree' doctrine has not been limited to cases in which there has been a Fourth Amendment violation. The Court has applied the doctrine where the violations were of the Sixth Amendment, see *United States* v. *Wade,* 388 U. S. 218 (1967), as well as of the Fifth Amendment." *Nix* v. *Williams, ante,* at 442 (footnote omitted).

Accord, *United States* v. *Crews,* 445 U. S. 463, 470 (1980).[11] When they ruled on the issue, the New York courts were

---

[11] As our decisions in *Nix* and *Crews* reveal, the treatment of derivative evidence proposed in JUSTICE O'CONNOR's opinion concurring in the judg-

entirely correct in deciding that Quarles' gun was the tainted fruit of a nonconsensual interrogation and therefore was inadmissible under our precedents.

However, since the New York Court of Appeals issued its opinion, the scope of the *Wong Sun* doctrine has changed. In *Nix* v. *Williams, supra,* this Court construed *Wong Sun* to permit the introduction into evidence of constitutionally tainted "fruits" that inevitably would have been discovered by the government. In its briefs before this Court and before the New York courts, petitioner has argued that the "inevitable-discovery" rule, if applied to this case, would permit the admission of Quarles' gun. Although I have not joined the Court's opinion in *Nix*, and although I am not wholly persuaded that New York law would permit the application of the "inevitable-discovery" rule to this case,[12]

ment in part and dissenting in part, *ante,* p. 660, represents a much more radical departure from precedent than that opinion acknowledges. Although I have serious doubts about the wisdom of her proposal, I will not discuss them here. Petitioner never raised this novel theory of federal constitutional law before any New York court, see Brief for Appellant in No. 2512/80 (N. Y. Ct. App.); Brief for Appellant in No. 2512–80 (N. Y. App. Div.), and no New York court considered the theory *sua sponte.* The matter was therefore "not pressed or passed on in the courts below." *McGoldrick* v. *Compagnie Generale Transatlantique,* 309 U. S. 430, 434 (1940). Since petitioner's derivative-evidence theory is of considerable constitutional importance, it would be inconsistent with our precedents to permit petitioner to raise it for the first time now. See *Illinois* v. *Gates,* 462 U. S. 213, 217–223 (1983). An independent reason for declining to rule on petitioner's derivative-evidence theory is that petitioner may have been barred by New York procedures from raising this theory before the New York Court of Appeals. See n. 12, *infra.* Even if the claim were properly presented, it would be injudicious for the Court to embark on a new theory of derivative evidence when the gun in question might be admissible under the construction of *Wong Sun* just enunciated by the Court in *Nix* v. *Williams.* See, *infra* this page and 690.

[12] At least two procedural hurdles could prevent petitioner from making use of the "inevitable-discovery" exception on remand. First, petitioner did not claim inevitable discovery at the suppression hearing. This case therefore contains no record on the issue, and it is unclear whether the question is preserved under New York's procedural law. *People* v. *Mar-*

I believe that the proper disposition of the matter is to vacate the order of the New York Court of Appeals to the extent that it suppressed Quarles' gun and remand the matter to the New York Court of Appeals for further consideration in light of *Nix* v. *Williams.*

Accordingly, I would affirm the order of the Court of Appeals to the extent that it found Quarles' incriminating statement inadmissible under the Fifth Amendment, would vacate the order to the extent that it suppressed Quarles' gun, and would remand the matter for reconsideration in light of *Nix* v. *Williams.*

---

*tin,* 50 N. Y. 2d 1029, 409 N. E. 2d 1363 (1980); *People* v. *Tutt,* 38 N. Y. 2d 1011, 348 N. E. 2d 920 (1976). Second, the New York Rules of Criminal Procedure have codified the "fruit-of-the-poisonous-tree" doctrine. N. Y. Crim. Proc. Law § 710.20(4) (McKinney 1980 and Supp. 1983–1984). Even after *Nix* v. *Williams,* Quarles' gun may still be suppressed under state law. These issues, of course, are matters of New York law, which could be disposed of by the New York courts on remand.