## UNITED STATES

### v.

**Captain James A. WAKIN, 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 Fv, United States Air Force.**

### ACM 26112.

U.S. Air Force Court of Military Review.

Sentence Adjudged 27 Feb. 1987.

Decided 26 Sept. 1988.

Appellate Counsel for the Appellant: Steven S. Mitchell, Alexandria, VA 22314, Colonel Leo L. Sergi and Major Deborah A. Baker.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Captain Marc Van Nuys.

Before FORAY, MICHALSKI and MURDOCK, Appellate Military Judges.

## DECISION

MURDOCK, Judge:

This case involves the relationship between criminal prosecutions and the Air Force program for self identification of drug abusers. After losing a lengthy suppression battle, the appellant, a flight

nurse stationed at Clark Air Base, entered conditional guilty pleas to charges of dereliction of duty and making false official statements. In our view, both charges related to his active abuse of drugs. He was found guilty by a military judge sitting alone and sentenced to dismissal, confinement for 12 months, and forfeiture of $300 per month for 12 months. Because we find the military judge erred by refusing to dismiss the charges, we will discuss only one of the four errors asserted by the appellant. In that error, the appellant asserts the charges should have been dismissed where the evidence was directly related to the appellant's personal drug abuse which he had revealed under the Air Force self identification program. We agree.

The evidence indicated that the appellant had suffered from a serious drug dependency for some time before his problem came to official attention. Unfortunately, he was a flight nurse and the Officer in Charge of the aeromedical squadron's drug supply room. This was undoubtedly a very difficult assignment for anyone trying to resist the forces of drug addiction.

The case reached a crescendo on the weekend of 25–27 October 1985. The accused was the lone medical officer on a routine C–9 aeromedical flight in the Pacific. Sometime during the flight one of the medical technicians found a needle and a syringe in the aircraft latrine sink. The technician disposed of the needle assembly in the authorized container and returned to his other duties. About an hour later the same technician found a tourniquet in the same latrine. Both the needle assembly and the tourniquet had blood spots on them which, the technician testified, indicated they had been used for an intravenous injection. After this second discovery the technician reported his findings to the appellant and asked for guidance. The appellant told him that he, the appellant, would write it up. Later in the flight the technician discussed the discoveries with another technician on board. They decided the discoveries should be entered on the form used to record unusual circumstances of a flight. As medical crew director, the appel-

lant had to sign the form, which he did. The form was routed through normal squadron channels to the Superintendent of Nursing Service, a Chief Master Sergeant.

The form was not completely reviewed by squadron officials until after the appellant revealed his drug abuse to a social actions counsellor as part of his drug abuse self identification. However, on the day after the flight, the technician who found the drug equipment showed the form to the Superintendent of Nursing Service and discussed the incident with him. The superintendent testified that when he heard about the equipment being found on board he recalled a mission he had flown with the appellant. During that flight the appellant had fallen asleep and "nearly had put a cigarette into a pillow, and also there had been a syringe found in a latrine". He stated that at the time he "didn't place it with anything". However, when he heard about the incident involved in this case he testified "I thought, well, maybe there is something going on...." The superintendent was leaving on a flight and had no time to follow up on the matter. He decided to report the situation to the chief nurse when he returned from the flight on Monday afternoon.

About 2130 on the evening the appellant returned from his flight, his wife called Captain Folden, a deacon in their church. The deacon was a flight nurse and a member of the appellant's squadron. He testified that, as a deacon in the Reorganized Church of Jesus Christ of Latter Day Saints, he held an ordained "priesthood" in his church. He explained that his responsibilities include family counselling and family ministry.

Captain Folden testified that he was not surprised by Mrs. Wakin's call because she had told him about two weeks earlier that she might want to talk to him in the future, although she did not say why. Additionally, based on his own observations, he had begun to wonder about the appellant's deteriorating performance. He had asked at least one other squadron member and tried, in a general way, to see whether anyone thought the appellant might be associated

with the increased incidence of broken tabs the squadron was experiencing on narcotics containers.

At Mrs. Wakin's invitation, Captain Folden went to the Wakin quarters the night of the call. When he arrived Mrs. Wakin came right to the point by saying "James has a real problem, he's been taking drugs". He discussed the situation with Mrs. Wakin for about two hours, but did not see the appellant.

During their conversation, Captain Folden suggested, "maybe we should talk to an attorney". They called Captain Feder, an area defense counsel assigned to the base. He agreed to talk with the appellant "first thing Monday morning". During the conversation with Captain Folden that night, Captain Feder mentioned the Air Force drug abuse self identification program governed by Air Force Regulation (AFR) 30–2, *Social Actions Program*. He advised it would not be "the best thing" for the appellant to talk to his commander or chief nurse at that stage.

Sometime after the conversation with Captain Folden, Captain Feder called Master Sergeant Melendez, a social actions drug and alcohol counselor at the base. He told Sergeant Melendez that he had a client who was in "very bad shape and he felt that he needed some attention sooner than Monday". Sergeant Melendez agreed to see Captain Feder and the appellant and his wife at 1400 Sunday afternoon.

When they met at the social actions office, Sergeant Melendez read the provisions of the self identification program to the appellant directly from the regulation. He specifically mentioned that social actions counsellors could not offer any confidentiality and that portions of the file would be revealed to other base officials such as the members of the rehabilitation committee, or members of the appellant's chain of command.

Sergeant Melendez testified that before accepting someone into the self identification program, he always contacted that person's commander to determine whether an investigation had begun. In the present case, the appellant's "acting commander"

told him that the appellant was not "under any form of investigation". Sergeant Melendez specifically asked whether there was a urinalysis pending or whether the Air Force Office of Special Investigations (AFOSI) or the security police were investigating the appellant. He was assured that no such actions were pending. Based on these assurances, Sergeant Melendez told the appellant he probably qualified for entry under the self identification program. He then questioned the appellant about the extent and nature of his drug problem. As a result of this interview, the appellant was referred to the base medical center for detoxification.

At the same time the appellant was being treated, his squadron was attempting to determine what effect his newly revealed drug involvement might have had on the squadron mission. Because the appellant was the officer in charge of the squadron "drug room", the commander decided to conduct an inventory of the drug room. Before the inventory began, the squadron chief nurse and his assistant went to the drug room to change the combination of the drug vault. When they opened the "locked narcotic box" which contained the instructions on how to change the combination they noticed that all the morphine and demerol containers in the box had broken safety tabs and the contents appeared to have been adulterated. After discovering this, the two officers went straight to the commander. He told them to lock everything up and await further instructions.

The commander then contacted the base legal office for advice. The legal officer told the commander that he would notify the AFOSI for him. Shortly afterwards the AFOSI contacted the commander.

The appellant was ultimately tried on two charges developing out of the preceding situation. The first charge was dereliction of duty in trying to convince a noncommissioned officer not to report the drug items found on the airplane. The second charge was signing false official controlled substance rosters which appeared to document that drugs had been administered to

authorized patients when in fact they had not.

As part of a concerted national effort to control drug abuse, the Federal government, the Department of Defense, and the Air Force have all adopted comprehensive drug abuse programs. *See* Pub.L. No. 92–255, 86 Stat. 65; DOD Dir. 1010.4, 25 Aug 1980; DOD Instr. 1010.3, 4 Aug 1983; 32 C.F.R. 62; and AFR 30–2.

When it passed the Drug Abuse Office and Treatment Act of 1972, Congress found that

> [c]ontrol of drug abuse requires the development of a comprehensive, coordinated long-term Federal strategy that encompasses both effective law enforcement against illegal drug traffic and effective health programs to rehabilitate victims of drug abuse.

Not surprisingly, many Federal programs involve more than one approach to the drug abuse problem. Some elements of the programs address detection, prosecution, and punishment of drug offenders. Congress' addition of a new article, Article 112a, 10 U.S.C. § 912a, to the Uniform Code of Military Justice illustrates Federal efforts against illegal drugs in the military. This article consolidated and strengthened criminal sanctions for drug involvement in the uniformed services. Recognizing that the addictive nature of drugs makes it difficult for many abusers to stop using drugs even when they want to, agencies have developed drug awareness and rehabilitation programs. The Air Force drug awareness and rehabilitation program is the Drug and Alcohol Abuse Control Program, part of the Air Force Social Actions Program. Some provisions of this program allow a certain sanctuary for offenders who voluntarily admit their addiction and seek help.

The specific provisions of the Air Force "sanctuary program" have changed occasionally since its inception, but the basic philosophy has remained essentially the same. That is, if a servicemember qualifies for protection under the program, what the person reveals about personal use of drugs generally will not be a proper basis for criminal prosecution.

■ This is the crux of this case. Did the appellant qualify under the "sanctuary program" then in effect, and if he did, how encompassing was the protection offered by the rehabilitation program meant to be? The military judge denied a motion to suppress any evidence relating to all charges and specifications obtained directly or indirectly as a result of the appellant's self identification as a drug abuser. When he announced his denial of the motion, he concluded, in part, that the appellant qualified for the protections of the Air Force self identification program. We agree.

■ That leaves the difficult question of the scope of the rehabilitation program's protection. In his findings and conclusions of law, the military judge reasoned that the commander had exercised a proper command prerogative in having the drug room inventoried. Further, that the appellant had no expectation of privacy in the contents of the drug room since it was all government property. Finally, that the inventory was motivated by a concern for public safety because the drugs were used in providing health care, and that the presence of adulterated drugs in health care channels presented a "genuine threat to public safety". These factors led him to conclude that the squadron and AFOSI inventory actions were within the public safety exception to the exclusionary rule articulated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). He then denied the motion to suppress.

We part company with the military judge at this point. The public safety interest in *Quarles* was protecting shoppers, particularly children, from the dangers of a loaded pistol which the police had reason to believe Quarles had left on a supermarket shelf. In our view the *Quarles* situation had far more potential for immediate danger than the threat presented by narcotics containers which have obviously been tampered with. The tampering and possible adulteration was immediately apparent to the trained personnel who found the containers. It would also have been obvious

to the trained personnel who might have wanted to administer the drugs they should have contained.

A concern for public safety does not mandate admission of information about an accused's drug involvement, particularly when specific statutory or regulatory provisions provide for its exclusion. The Air Force drug and alcohol abuse control program contains specific provisions for exclusion of drug related information in certain cases. That is where we must look for guidance on the admissibility of information about the appellant's drug involvement.

The preface to Air Force Regulation 30–2, *Social Actions Program,* current at the time of the appellant's self identification states:

> This regulation sets up and explains the Air Force Social Actions Program. It outlines Air Force policy for the Social Actions, Equal Opportunity and Treatment (EOT), Human Relations Education (HRE), and Drug and Alcohol Abuse Control programs.... This regulation applies to all military personnel of the Air Force.

AFR 30–2, *Social Actions Program,* (22 Jun 1981).

▉ The drug self identification program in that regulation said this about the program and its protections:

> 4–3D Self Identification. Personnel with drug or alcohol problems are encouraged to seek assistance. Air Force members concerned about a drug or alcohol problem may refer themselves for the evaluation process. Personnel in this status must complete the DAAEP [Drug and Alcohol Abuse Evaluation Process] to assess the scope of their problem. Following the DAAEP a rehabilitation committee will recommend an appropriate course of action to the commander.
>
> (1) Under the conditions specified below, an Air Force member's voluntary submission to an Air Force treatment and rehabilitation program, and self-disclosed evidence of prior personal drug use or prior possession of drugs for personal use voluntarily disclosed by the member as part of the first entry into such programs, may not be used against the member in disciplinary action under the UCMJ or to characterize an administrative discharge....

AFR 30–2, IMC 82–3, paragraph 4–3D.

When the Air Force established the self identification program it was obvious from its terms that some servicemembers who had committed criminal acts under the UCMJ would be protected from prosecution. This protection would be meaningless if the servicemember had to sanitize his environment completely before he sought help. It is the inability to cope with the habit which motivates self identification. The same inability might make it impossible for an abuser to rid himself of all drugs or paraphernalia before seeking help.

The appellant's suppression motion sought to have the two charges against him dismissed. He asserted that the evidence used to prove the charges was so intertwined with his self identification that it should all be suppressed. We agree.

The statements the appellant made during his self identification were not used against him. However, the drug paraphernalia on the airplane, the condition of the patient logs, the damaged drug containers and inaccurate inventory levels in the drug room were inextricably woven together with his personal drug problem.

Although it may be tempting on the surface to consider the information which was introduced at trial about these matters to be from independent sources, we cannot do so. The only reason the command conducted an inventory of the drug room when they did was because the officer in charge of the drug room (the appellant) had identified himself as a drug abuser. The command action was reasonable and foreseeable, but that does not make it admissible. Similarly, the reason the unusual circumstance form drew any attention was because it appeared to indicate someone on the airplane had abused drugs—not because it might have indicated a dereliction on the part of the medical crew director. It was only when the Superintendent of Nursing Service remembered a previous incident

that the form assumed importance. That importance was as a possible indicator of the appellant's personal use of drugs.

The charges dealt with two aspects of the appellant's drug activities. The first charge was that the appellant had been derelict in trying to convince an NCO not to report the drug related items he had found on the airplane. This charge does not allege the appellant's personal use of drugs. As such, it might seem to be outside the protection of the self identification program. Unfortunately, in the appellant's drug addicted world, these items were a necessary part of his personal drug use. It was predictable he would try to hide his drug use as long as possible. Trying to convince the NCO not to report his discovery was part of the appellant's efforts to keep his personal use of drugs secret. The situation might have been different if the drug items had not been used by the appellant and he had been motivated by a desire to help some other drug abuser avoid detection. In that case, his subsequent self identification would not offer protection for the dereliction. But where, as in this case, his dereliction was designed to keep his personal drug use secret, we infer from the circumstances that his misguided efforts were part and parcel of his personal drug use and were protected by the self identification program.

The second charge relates to the appellant's falsifying drug control documents to cover his use of government drugs which were legitimately in his custody. This type of secretive activity is similar to that involved in the first charge and is equally woven into the appellant's personal drug use. When a servicemember's personal drug use involves government drugs, we can hardly expect him to reveal his situation by boldly signing his own name to the control log each time he takes some of the drugs he craves. His attempt to conceal his theft of government drugs was a predictable part of his personal drug use and was protected by the self identification program.

In this case we have applied the Air Force social actions program that was in effect at the time of the appellant's self identification. However, the essence of both the preface and the self identification program have remained unchanged in the current edition of AFR 30-2. AFR 30-2, *Social Actions Program,* (18 Apr 1986), preface and paragraph 4-2b. It appears essentially the same law would be applied to a case with similar facts if it were to occur under the current version of the regulation. *See United States v. Alexander,* 26 M.J. 988 (A.F.C.M.R.1988).

The evidence used to convict the appellant should have been suppressed as protected under the self identification provisions of the Air Force Drug and Alcohol Abuse Control Program. We find there is insufficient admissible evidence to support the charges. Article 66(c), UCMJ, 10 U.S.C. § 866(c). Accordingly, the findings of guilty are set aside and the charges and specifications are dismissed.

Senior Judge FORAY and Judge MICHALSKI concur.