**UNITED STATES of America, Plaintiff,**

v.

**Brian TISDALE, Defendant.**

**No. 99–10016.**

United States District Court, D. Kansas.

Sept. 7, 1999.

---

Mona L. Furst, Office of United States Attorney, Wichita, KS, for Plaintiff.

Ernest L. Tousley, O'Hara, O'Hara & Tousley, Wichita, KS, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on the defendant's motions to suppress evidence. (Docs. 25 & 26). The court held an evidentiary hearing on September 1, 1999, and orally denied the motions at the conclusion of the hearing. This written memorandum will supplement the court's oral rulings.

The court finds the following facts from the evidence presented at the hearing. Wichita police officers were dispatched to the scene of a shooting shortly after 2:00 a.m. on Saturday, July 25, 1998. Officer Buckman of the WPD went to the scene and saw a black male laying on the ground in the front yard between two residences at 1645 and 1651 North Hydraulic Street in Wichita. The man was wounded. Officer Buckman recognized him as Bryan Tisdale. She or other officers at the scene knew from prior contacts with Tisdale that 1645 Hydraulic was his residence and that a Nissan automobile backed into the driveway was his. Tisdale was able to communicate. He complained of pain in his calf, and Buckman could see what appeared to be a gun shot wound in his calf. He had other wounds as well. Buckman asked him what happened. Tisdale said he had heard a noise outside of his house and when he went outside to look, he got shot. Buckman asked who shot him and Tisdale replied, "He did," pointing a short distance away to where another man was lying on the ground by the driveway. Buckman had not previously noticed the other man, and she or other officers went over to investigate. They saw a young male lying on the ground with a bandana over his face and a semi-automatic gun in his hand. He had suffered a serious head wound and was apparently dead. He was pronounced dead at the scene a short time later.

Based on the number of shell casings and other circumstances, Officer Buckman believed more than one gun had been involved in the shooting, and she asked Tisdale whether he had a gun. He initially denied having a gun, pointing out that he was on probation, but after being asked several times said that he had had a gun in his pocket when he came out of his house. When Buckman asked where it was, he said, "Over there." The officers had not given Tisdale any Miranda warnings. One of the officers present patted Tisdale down. At that point, Buckman or another officer spoke with David Howard, who was at the scene and who lived at 1651 Hydraulic. Howard volunteered that he had the gun in his house. Officer Kimble of the WPD went with Howard into the house at 1651 Hydraulic to get the gun. Kimble found a black semi-automatic handgun and a bag of what appeared to be crack cocaine under a couch in the house. Howard said that he had found Tisdale in the yard and that Tisdale asked him to hide the gun and the cocaine.

Officers found numerous shell casings in the front yard of the two residences. They also found bullet holes in the defendant's residence at 1645 Hydraulic. After finding the gun at 1650 Hydraulic, officers made a sweep of the defendant's residence at 1645 Hydraulic to determine if there were any other victims or other persons in that house. They entered each room of the house to see if anyone was there. They found no one. They did not search drawers or any items in the house. They saw no contraband or other evidence.

They were in the house for approximately 60–90 seconds.

Officer Hamilton of the WPD interviewed Laketha Lee at the scene. Lee was the defendant's girlfriend, and said that she had talked with the defendant on the hone shortly before the shooting. Lee said that during that conversation, Tisdale said that he had heard a noise outside the house and that he had found the trunk of his car open, although nothing was missing. Lee believed that Tisdale was talking to her on a cordless or cell phone while he was in the yard of his residence. The shooting occurred shortly after this conversation ended. Lee had been a few houses away, and came to the scene after she heard the shots.

By this time, police suspected that dead man near the driveway had been attempting to burglarize or rob Tisdale. Lee told the police that Tisdale had a lot of nice things—clothes, cars, etc.—that people might want to steal. Lee, who lived with Tisdale at 1645 Hydraulic, said they had been robbed in December of 1997.

As stated previously, officers had seen the defendant's Nissan automobile in the driveway of the house next to where the dead man was found. They knew it was a car he drove regularly. Around the side or towards the back of the residence, officers found two additional cars that were covered by a tarp or cloth. One of the cars was a Buick Regal. Lee testified on direct exam that during her interview with Officer Hamilton she quoted the defendant as saying that someone had tampered with the trunk of his Buick Regal. During cross-exam, however, Lee conceded she was not sure if she had told Hamilton it was the Regal or if she had just referred to "the [defendant's] car."

Officer Harris of the WPD interviewed another witness, Evonne Harris, who said she heard the defendant say shortly before the shooting that someone had been in the trunk of his Regal. Officer Harris told another officer at the scene what Lee had said.

Detective Moore of the WPD subsequently interviewed Laketha Lee at the police station. During that interview, which was recorded and transcribed, Lee again mentioned that during her phone conversation with Tisdale he had said he found the trunk of his car open. She did not say he was referring to the Regal. Moore was under the impression that the car she was talking about was the Nissan in the driveway, which was near where the dead man was found. Lee seemed to confirm this during her interview when she indicated that the Nissan had some big speakers or other music-related items in it that somebody might want to steal.

Sergeant Allen of the WPD went to the scene to get information from the various officers there. He then went back to the station. He spoke with Detective Moore. He helped prepare an application for search warrant and an affidavit in support thereof for the residence at 1645 Hydraulic and the Nissan automobile in the driveway. He was aided in doing so by an Assistant District Attorney. The affidavit summarized the circumstances known to the police. It included an assertion that Laketha Lee said Tisdale told her during the phone conversation that he had returned home earlier and "had found the trunk of his 1992 Nissan Maxima open" but found nothing missing.

The application for search warrant was presented to and signed by Judge Clark Owens of the District Court of Sedgwick County, Kansas. A warrant was issued and was executed upon the residence at 1645 Hydraulic and the Nissan automobile in the driveway. Evidence incriminating the defendant on the charges in the indictment was found both in the house and in the car.

Melissa Renner, an Intensive Supervision Officer with the Sedgwick County Community Corrections, was the defendant's supervising probation officer on a case out of state court. She testified at the suppression hearing that after she

learned of the shooting she called the defendant while he was hospitalized at St. Francis Medical Center. She called him because she was concerned for his well-being and because she was concerned as to whether he had violated the conditions of his probation, which included a prohibition on possession of firearms. Tisdale told her over the phone that he had seen a man in a mask at the door, that he had grabbed Laketha's gun, that the man had shot at him several times and that he had fired back. Renner also apparently spoke with Tisdale the next day at the hospital. After this, Renner caused an arrest warrant for probation violation to be issued for the defendant. The defendant was not immediately arrested, however. Sedgwick County officials made an arrangement under which the hospital security guard was to be notified when the defendant was going to be released from the hospital, and it was contemplated that the defendant would be arrested at that time.

After the defendant was arrested, Detective Moore and another officer went to see him in the jail infirmary. They read the defendant his Miranda rights. The defendant responded by saying he did not want to talk without an attorney present. The officers prepared to leave, and told the defendant to have his attorney get in touch with them. At that point, the defendant said that he knew Marlin Jackson,[1] and that Jackson had been to his house a couple of times. The officers responded by telling Tisdale to have his attorney call them so they could get his side of the story. Tisdale again said that he knew Jackson and that he used to work with him.

*Arguments.*

In his motions to suppress, defendant made the following arguments: (1) the search warrant for his house and car was so lacking in probable cause as to render any reliance upon it by the officers who executed it unreasonable; (2) all of the statements made by the defendant should be suppressed, because he was questioned by officers while his liberty was restrained and he was not given Miranda warnings; he was interviewed in the absence of his attorney after stating he wanted the attorney present during questioning; and all of his later statements were the fruits of the initial unlawful questioning. Additionally, the defense asserted at the suppression hearing that officers had knowingly included false information in the application for the search warrant.

■ 1. *Probable Cause for Warrant.* "In determining whether probable cause exists to issue a warrant, the issuing judge must decide whether, given the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Simpson,* 152 F.3d 1241, 1246 (10th Cir.1998). A judge's determination of probable cause is afforded great deference and should be upheld "as long as the judge had a substantial basis for finding that probable cause existed." *Id.*

■ The affidavit submitted in support of the search warrant in this case set forth sufficient facts for a neutral and detached magistrate to determine that probable cause existed to support the search of the defendant's residence and his Nissan automobile. According to information the police obtained from Mr. Howard, just after the shooting the defendant had asked Howard to hide crack cocaine and a gun that Mr. Tisdale had in his possession. Common sense suggests that if the defendant had such items with him before the shooting, they had been kept either in his house or in his car. Common sense also suggests that other evidence related to those items would be found in the same place. Additionally, given the bullet holes in the residence and the defendant's admission that he possessed a gun, there was a fair probability of finding evidence in the house relating to the shooting. Likewise,

1. According to Det. Moore, Jackson was an accomplice of the dead man at the scene.

the facts in the affidavit disclosed a fair probability of finding evidence relating to the attempted burglary/robbery in the Nissan automobile because under the circumstances that car appeared to be the object of that offense. The facts cited thus give rise to a fair probability that evidence pertaining to the attempted burglary or robbery, the shooting, the possession of drugs, and the unlawful possession of a gun would be found inside the defendant's residence and in his Nissan parked in the driveway.

■ 2. *Good Faith Exception.* In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that evidence seized under a warrant later found to be invalid may be admissible if the executing officers acted in good faith and with reasonable reliance on the warrant. This inquiry turns on whether a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization.

■ The court concludes that the warrant and supporting affidavit were not so lacking in probable cause that the officers' reliance upon the warrant was objectively unreasonable. A reasonably well trained officer would not have known the search was illegal despite the authorization of the warrant. The affidavit contained extensive detail about the incident and provided a factual basis connecting the defendant's residence and car to these events. Thus, even if probable cause for the warrant was lacking in some respect, under the circumstances a reasonable officer could have believed the warrant to be sufficient. There is no evidence to show that the officers' reliance upon the warrant was not in good faith. Accordingly, the motion to suppress evidence seized from the defendant's residence and car must be denied.

■ 3. *Alleged false statements or omissions.* The defendant alleged that the police used false statements or knowingly omitted facts from the affidavit pre-sented in support of the search warrant. Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, without those false statements, would not be sufficient to support a finding of probable cause. *See Stewart v. Donges,* 915 F.2d 572, 581–82 (10th Cir.1990). If the defendant establishes by a preponderance of the evidence that a false statement was included in the affidavit by the affiant "knowingly and intentionally, or with reckless disregard for the truth," and the false statement was "necessary to the finding of probable cause," then the "search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. The standards of "deliberate falsehood" and "reckless disregard" set forth in *Franks* apply "to material omissions, as well as affirmative falsehoods." *Stewart,* 915 F.2d at 582.

■ The defendant has not demonstrated there was any deliberate falsity or reckless disregard for the truth as to any assertions in, or omissions from, the affidavit in support of the warrant. That is true both as to the officer who completed the affidavit and the officers who supplied information used in the affidavit. There is no evidence to persuade the court that the officers intentionally or recklessly misled the state judge about which car supposedly had its trunk opened shortly before the shooting. The transcript of Ms. Lee's statement to the police shows she indicated to them during her interview at the station that it was the Nissan which had its trunk open and which was the likely object of the attempted burglary. The circumstances at the scene seemed to confirm that scenario. While there may have been a failure to communicate by some officers as to one or two witness state-

ments that the defendant had said the trunk of his Buick Regal was found open, rather than the Nissan, the court concludes that any failure in this regard was inadvertent.[2]

4. *Alleged Failure to Give Miranda Warnings.* The defendant argues that all of the statements he made to police should be suppressed.

■■■■ The court concludes that the defendant's statements to officers while he was lying on the ground outside his residence should not be suppressed. In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Court held that police officers do not need to recite Miranda warnings prior to questioning when they "ask questions reasonably prompted by a concern for the public safety." *Id.* at 656, 104 S.Ct. 2626. Given the fact that the officers reasonably believed a gun was somewhere in the vicinity in a residential neighborhood, the police had an objectively reasonable concern for public safety and could question the defendant about the gun without first giving him Miranda warnings.

■■■■ Additionally, Miranda is only required when the defendant is in police custody. A determination of whether an individual was in custody must be made on the totality of the circumstances, and the ultimate inquiry "is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). The court concludes that when the defendant was laying on the ground in the front yard after being shot, he was not in police custody. The evidence suggested that the defendant was unable to leave the scene because he was wounded, but nothing suggests he was

kept there through physical force or by a show of authority from the police. There is no evidence that the police deprived the defendant of his freedom. Nor is there evidence that he was questioned by the police in a particularly coercive environment, or that any of the statements the defendant made at the scene were not voluntary. In sum, the court finds that the motion to suppress should be denied with respect to the defendant's statements to police at the scene of the shooting.

■■■■ As for conversations between the defendant and Ms. Renner, his probation officer, there is no showing that the defendant was in police custody at the time he made those statements. Accordingly, Miranda does not apply. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

■■■■ Finally, with respect to statements made by the defendant to Detective Moore at the jail infirmary, the court concludes that such statements were not made in response to interrogation of the defendant, but were voluntarily made by him. A defendant who has invoked his right to counsel may not be subject to further interrogation unless he initiates the communication. *United States v. Giles,* 967 F.2d 382, 385 (10th Cir.1992) (quoting *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The term "interrogation" in this context refers to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

After the defendant requested an attorney, the officers told the defendant to have his attorney call them so that they could get his side of the story. There is no evidence to suggest that this statement

---

**2.** The court likewise concludes there was no intentional or reckless misrepresentation in the affidavit concerning which residence

(1645 or 1651 Hydraulic) police found the cocaine and gun in or which residence they intended to search.

was designed to elicit an incriminating response from the defendant or that the officers should have known it was reasonably likely to do so. The officers' response shows they were willing to honor the defendant's request and that they ceased attempts at questioning the defendant. The officers' explanation that they wanted the attorney to call so they could "get [the defendant's] side of the story" does not rise to the level of "interrogation" of the defendant. *Cf. United States v. Comosona,* 848 F.2d 1110, 1112 (10th Cir.1988) (after defendant requested attorney, officer's actions of handing defendant his card and inviting him to call collect if he wanted to talk further did not constitute interrogation).

*Conclusion.*

The evidence shows no basis for suppression of evidence obtained pursuant to the search warrant or of evidence of the defendant's statements to police. The defendant's motions to suppress (Docs. 25 & 26) are therefore DENIED.