**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**AURIEL DEVON FRETT, Defendant**

ST-08-CR-452

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

February 18, 2011

RENÉE GUMBS CARTY, ESQ., Assistant Attorney General, Department of Justice, St. Thomas, USVI, *Attorney for Plaintiff.*

MICHAEL JOSEPH, ESQ., Christiansted, St. Croix, USVI, *Attorney for Defendant.*

WILLOCKS, *Judge*

## MEMORANDUM OPINION

(February 18, 2011)

**THIS MATTER** came before the Court on a Motion to Suppress the Statement made by the Defendant Auriel Devon Frett. The People have filed an Opposition; the Defendant has filed a supplemental and the People filed a response to the supplemental.

## FACTS

On or about October 26, 2008, Auriel Devon Frett (hereinafter, "Frett") and John Southwell (hereinafter, "Southwell") allegedly were catching a ride from at the top of Cassi Hill, St. Thomas. The victim, Gabriel Lerner (hereinafter, "Lerner") stopped and picked up Frett and Southwell. Frett and Southwell stopped at a grocery store leaving Lerner in the car alone. When they arrived at Hull Bay, Lerner was placed in the trunk of the vehicle. Frett and his accomplice drove Lerner to Bordeaux, pass the Water Bible College. Once there, Lerner was taken out of the trunk and walked the path into the bushes. When they reached a spot along the pathway, Lerner was shot in the back of his head. Both defendants fled the

area.[1] On or about October 28, 2008, Frett and Southwell were seen driving the victim's car. A high speed chase ensued but Frett and Southwell were able to elude the police. An all point bulletin was posted and another chase ensued. The vehicle driven by Frett and Southwell crashed into a police vehicle and was disabled. Frett and Southwell ran from the vehicle but were later captured. Southwell, then a minor was brought to the investigation bureau and in the presence of his mother was advised of his constitutional rights, waived them and gave a statement to the police in which he implicates Frett as the killer of Lerner.

On October 28, 2008, at about 6:42 p.m., Frett was interviewed by either Detective Jason Marsh (hereinafter "Detective Marsh") or Detective Mario Stout (hereainfter "Detective Stout"). Frett signed his name on the Warning As to Rights and Waiver Form, acknowledging that he was read his constitutional rights and consented that he wished to waive his rights. Frett began to give a statement, about two pages, and at approximately 7:01 p.m. Frett told Detective Marsh he wanted an attorney. At that point, Detective Marsh stopped the questioning and left the room to go talk to Southwell in the Investigation room, who was simultaneously being questioned regarding Lerner's murder. Frett remained in the room with Detective Stout.

Several hours later, Detective Stout went by the door and someone told him that Southwell was cooperating and gave a statement indicating that Frett was responsible for the killing. Detective Stout, without prompting or solicitation from Frett, proceeded to share that information with Frett. Upon being told about that he was implicated in the murder, Frett told Detective Stout he wanted to make a statement Frett was again advised of his constitutional rights and signed the Warnings As to Rights form at 10:05 p.m. on the 28th of October 2008. Frett gave Detective Stout a five page written statement (hereinafter, the "Second Statement").

Frett has moved to suppress his statement. The People have filed their opposition; Frett has filed a supplemental and the People have filed a response to the supplemental.

## DISCUSSION

Frett initially argued that the Warning as to the Rights and Waiver Form was defective under *Florida v. Powell*, 130 S. Ct. 1195, 175 L. Ed. 2d

---

[1] Frett denies that he was present with Southwell at the time of the murder.

1009. The Court finds no merit in that argument. However, the Court finds Frett's argument that the words spoken to him after he requested an attorney constituted an interrogation to be meritorious.

■ The interrogation of a suspect in police custody (custodial interrogation) threatens the Fifth Amendment privilege against self-incrimination because it allows police officers with the opportunity to (1) actively compel confessions through overtly coercive interrogation or (2) passively compel confessions by exposing suspects to the "inherently coercive" environment create by custodial interrogation. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). Hence, before questioning a suspect in custody, law enforcement officers must inform him in substance that (1) he has the right to remain silent, (2) anything he says can be used against him in a court of law, (3) he has the right to the presence of an attorney, and (4) if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Id.* at 662.

In this instant matter, it is uncontroverted that Frett was in custody, read his rights, and knowingly and voluntarily waived them. It is further uncontroverted that during the custodial interrogation of Frett, he (Frett) demanded to see an attorney. At that time, the questioning stopped. A few hours later, Detective Stout, who had remained in the room alone with Frett after the questioning had stopped, went by the door and learned that Southwell, who was being questioned simultaneously in a different room, was cooperating and gave a statement indicating that Frett had committed the murder. At that time, Frett told Detective Stout that he (Frett) wanted to make a statement. Detective Stout re-advised Frett of his constitutional rights and Frett signed another Waiver and Consent Form. After having been advised of his right and signing the Waiver and Consent Form, Frett gave Detective Stout a second written statement approximately five pages long.[2]

■ The central issue before this Court is whether the words uttered by Detective Stout after Frett had demanded to see an attorney was of such to constitute interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). To

---

[2] The Parties stipulated to the facts mentioned in this paragraph.

make that determination, the Court must do a two prong analysis. The first is whether the statement made by Detective Stout is the equivalent of interrogation and the second is whether Detective Stout should have known that, by making this statement, it was reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301.

■■ The *Miranda* Court has opined that once a defendant in custody asks or demands to speak to his attorney, all interrogations must cease until a lawyer is present. *See Miranda*, 384 U.S. at 474. In *Miranda*, the Court stated:

> Once warnings have been given, the subsequent procedure is clear. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with an attorney and to have him present to subsequent questioning. If the individual cannot obtain an attorney and he wants one before speaking to police, they must respect his decision to remain silent. *Id* at 473-474.

The Court in *Innis* defined custodial interrogation as:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

> That is to say, the term "interrogation" under Miranda refers *to* express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should now are reasonably likely to elicit an incriminating response from the suspect. 446 U.S. at 301.

■■ Similar to *Innis* case, there is no question that the defendant invoked his Miranda rights after the initial statement. Now the Court must first look at whether or not Frett was subject to interrogation as defined by *Innis*. Thus, the Court must determine whether the words used by Detective Stout falls within the ambit of interrogation. The undisputed facts are that Detective Stout, without prompting or solicitation from Frett, told Frett that his co-defendant was cooperating and had stated that he (Frett) had committed the murder. This was not a mere conversation among police officers in which the defendant overheard. This was a conversation initiated by Detective Stout. It is beyond question that, once

226

a person who is in custody and is subject to custodial interrogation requests an attorney, the *cadit quaestió* unless initiated by the person in custody. The Court in *Edwards v. Arizona* stated:

> We further hold that an accused such as Edwards, having expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police. 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

■ An incriminating response as defined in *Miranda* as any response, whether inculpatory or exculpatory that the prosecution may seek to introduce at trial. The *Miranda* Court stated:

> No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or of all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required of any other statement. 384 U.S. at 476-477.

■ The Court has reviewed the Second Statement given by Frett and finds it to fit the cube of an incriminating statement unambiguously — Frett's Second Statement, *inter alia*, places him in the company of Lerner and Southwell on the day Lerner was killed.[3] Frett was told without solicitation that Southwell was cooperating with the police and had given a statement accusing Frett of committing the murder. It stands to reason

---

[3] As mentioned previously, Frett denies that he was present with Southwell at the time of the murder.

that, if a person is told that another person or a co-defendant has accused him of committing a crime, that the accused will give a statement denying it. In this matter, the Court finds that Detective Stout reasonably should have known or knew that if such information was given to Frett, that Frett would give a statement denying such allegations.

The People contend that when Detective Stout made the comment to Frett about Southwell's cooperation with the police and Southwell's statement accusing him (Frett) of committing the murder, Detective Stout's intention was just to pass along information.[4] The Court disagrees with the People. Detective Stout was asked as to his intention for giving Frett the information and Detective Stout, under cross-examination from Attorney Joseph responded:

Q. And then your told him that his co-defendant, his then co-defendant was cooperating and he said you did it, you intended to have Mr. Frett cooperate with you also; isn't that the truth? You wanted him to co-operate with you?

A. Yes, if he wanted to give a statement.

THE COURT: Sony. Mr. Stout, speak a little slower and a little louder, please.

THE WITNESS: Yes Sir.

THE COURT: Repeat the answer, please. You inquired as to whether or not you wanted — and I am paraphrasing — you wanted him to give a statement as the basis for you telling Frett that the minor was cooperating. What was your response?

THE WITNESS: Yes Sir. (*See* Suppression Hearing Trans. p. 19, Ln. 2-19)

---

[4] "In this case, Detective Stout commented that co-defendant John Southwell had incriminated Frett in the murder of Mr. Lerner. Stout did not make the statement with the intent of eliciting an incriminating response from Frett. He was stating a fact Stout could not have reasonably thought that Frett would have responded in the manner in which he did. It is perceivable to believe that Frett may have said he would wait for counsel. However, he chose to waive his rights and provide a statement Frett did so knowingly and voluntarily and therefore this statement should be admissible." (*See* Response to the Defendant's Supplemental Motion For Suppression of Defendant's Statement, p. 1-2.)

Detective Stout would later state that his intention was to just let Frett know that Southwell was cooperating after apparently realizing the import of his answer. *(See* Suppression Hearing Trans, p.21, Ln. 9-25; p. 23 Ln. 4-13).

■ The *Innis* Court had made the following clear:

> The latter part of this definition (interrogation) focuses primarily upon the perception of the suspect, rather than on the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to invoke an incriminating response from a suspect thus amounts to interrogation. But since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response. 446 U.S. at 301-02.

Here, the Court needs not go into a detailed analysis of Detective Stout's intention when he made the unsolicited statements to Frett about Southwell's cooperation with the police and Southwell's statement accusing him (Frett) as the killer because the focus is "primarily upon the perception of the suspect, rather than on the intent of the police." *See Id* Ergo, the Court shall suppress the Second Statement made by Frett in response to Detective Stout actions.

## CONCLUSION

The Court finds that Detective Stout interrogated and violated Frett's Miranda rights when Detective Stout, without prompting or solicitation from Frett and *after* Frett had already requested an attorney a few hours earlier, told Frett about Southwell's cooperation with the police and Southwell's statement accusing him (Frett) of committing the murder because Detective Stout reasonably should have known or knew that Frett would give an incriminating response. Accordingly, the Court shall suppress Frett's Second Statement given in response to Detective Stout's unsolicited statements regarding Southwell. However, if Frett takes the stand, the statement may be used for impeachment pursuant to the Federal Rules of Evidence.