**Olivia DIKE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2010–CA–001846–MR.**

Court of Appeals of Kentucky.

Dec. 2, 2011.

**496**

Linda Roberts Horsman, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Ken W. Riggs, Assistant Attorney General, Frankfort, KY, for appellee.

Before MOORE, STUMBO, and WINE, Judges.

## OPINION

MOORE, Judge:

Olivia Dike appeals the judgment of the Graves Circuit Court following her conditional guilty plea to the charges of First Degree Possession of Methamphetamine, first offense; and Possession of Drug Paraphernalia, first offense. After a careful review of the record, we vacate the judgment against Dike because the circuit court erred in failing to suppress her statement and the evidence found as a result of her statement.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Officer Brent Farmer of the Mayfield Police Department testified during the suppression hearing[1] in this case. According to his testimony, he responded to a residence to assist Probation and Parole workers in carrying out an arrest warrant. Officer Farmer and the Probation and Parole workers heard someone inside the residence, so the Probation and Parole workers contacted the owner of the residence by telephone, who informed them that Dike was inside the residence. The owner gave them permission to enter because Dike was not coming to the door.

Once inside the bedroom of the house, Officer Farmer and the Probation and Parole workers found Dike inside the bedroom closet underneath some clothes.

---

1. It appears that no written motion to suppress was filed in the circuit court, but Dike's attorney orally moved to suppress the statements she had made to Officer Farmer before she was read her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Dike was incoherent, wearing only a t-shirt, and it appeared that she had fresh needle "tracks" in her arms. They picked her up and handcuffed her, and she had difficulty standing on her own. Officer Farmer attested that she "was in bad shape" and she was "out of it." He believed she had overdosed on drugs. In fact, according to the Commonwealth's response to Dike's motion to suppress filed before the circuit court, "Detective Farmer reasonably believed the Defendant's life may be in danger due to a drug overdose." He asked her what drugs she had taken, how much she had ingested, and where the needles were located. Officer Farmer testified that the reason he asked her if she had "shot up" and what she had taken was because he "was concerned about her life," not because he was trying to obtain evidence against her for a crime. Officer Farmer explained to the circuit court that his purpose for asking Dike these questions was because he intended to send her to the hospital due to her condition, and he wanted to be able to give as much information to hospital staff as he could. The best estimate that Dike was able to provide Officer Farmer was that she had ingested four grams of methamphetamine, possibly more. When Officer Farmer asked Dike where the needles were located, she directed him to a bag approximately four to six feet away from her. In that bag, Officer Farmer found several dirty needles and a silver spoon with methamphetamine residue in it. Despite Officer Farmer's belief that Dike's life was in danger, Farmer initially transported Dike to Graves County Jail rather than to the hospital. By the time Dike arrived at the jail with Officer Farmer, her condition had worsened, so an ambulance was called. Officer Farmer attested that he did not read Dike her *Miranda* rights before asking her questions about the type and amount of drug and the location of the needles.

Based on the fact that Officer Farmer found Dike with a silver spoon with methamphetamine residue in it and several dirty needles, Dike was charged with first-degree possession of methamphetamine, first offense; possession of drug paraphernalia, first offense; and of being a second-degree persistent felony offender (PFO–2nd).

Dike moved to suppress the evidence found as a result of her making statements to Officer Farmer without the benefit of the *Miranda* warnings. Officer Farmer attested that Dike was in custody from the moment he saw her in the closet and that she was in custody at the time he asked her questions about the drugs she had ingested and the location of the needles. Officer Farmer acknowledged that he had not Mirandized Dike. Additionally, Officer Farmer admitted that Dike did not just tell him of her own volition about the drugs and where the needles were located, but that she had only provided that information to him in responding to his questions. Officer Farmer stated that he had asked the questions for Dike's safety and also because he did not want to be accidentally stuck by a dirty needle. Officer Farmer acknowledged that he located the needles based upon Dike's responses to his questions.

The circuit court denied Dike's motion to suppress, noting "that there is a threshold that when a person is arrested for a DUI, they must be transported to the emergency room and examined before being booked in the jail." The court then stated that it found no Kentucky case on point, but it cited several cases from other states where the public safety exception to the *Miranda* requirement was applied to situations "where the officer believed the Defendant needed medical treatment, because controlled substances were ingested." The circuit court in Dike's case

found that Dike was in custody and no *Miranda* warning was given to her at the time she made the statements to Officer Farmer concerning what drug she had ingested, the amount, and where the needles were located. The court then reasoned as follows:

> It should be noted that the Defendant ... argues that since she told officers that she had ingested four (4) or more grams of methamphetamine, there was no need to obtain the paraphernalia.
>
> However, from the officer's testimony he gathered the items up and took them to the hospital. It appears to the Court, from the testimony it heard, that the officer was just taking a precaution, so that the medical treatment provider would have all the information that the officer had. That notwithstanding, the officer did want to find anything that might be of use in obtaining treatment for the Defendant, and would not wish to grope around where there were dirty needles. Regardless of the need to collect anything that might be useful in obtaining treatment for the Defendant, this Court feels that the officer would be sadly remiss if he left dirty needles and a controlled substance laying around.

Therefore, the court denied Dike's motion to suppress.

Dike entered a conditional guilty plea, which was conditioned upon her appealing the issues raised during the suppression hearing. In exchange for her guilty plea to the possession of methamphetamine and possession of drug paraphernalia charges, the Commonwealth recommended that the PFO–2nd charge be dismissed. The circuit court accepted Dike's conditional guilty plea and pronounced her guilty of first-degree possession of methamphetamine, first offense; and possession of drug paraphernalia, first offense. The court sentenced Dike to two years of im-

prisonment for the possession of methamphetamine conviction and twelve months of imprisonment for the possession of drug paraphernalia conviction, to be served concurrently to each other, but consecutively to a sentence she was serving at that time.

Dike now appeals, contending that the circuit court erred in failing to suppress the statements she allegedly made to Officer Farmer because the statements were the product of a custodial interrogation, and she was not provided her *Miranda* warnings.

## II. STANDARD OF REVIEW

Dike appeals the denial of her motion to suppress.

> If the trial court's findings of fact are supported by substantial evidence, then they are conclusive. We conduct *de novo* review of the trial court's application of the law to the facts. We review findings of fact for clear error, and we give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

*Bhattacharya v. Commonwealth*, 292 S.W.3d 901, 903 (Ky.App.2009) (internal quotation marks omitted).

## III. ANALYSIS

Dike contends that the circuit court erred in failing to suppress the statements she allegedly made to Officer Farmer because the statements were the product of a custodial interrogation, and she was not provided her *Miranda* warnings. The parties agree that Dike was in custody when Officer Farmer interrogated her about the type of drugs ingested, the amount of drugs ingested, and the location of the needles. Therefore, we need not determine whether a custodial interrogation occurred, as the parties have agreed to that fact.

The question we do need to answer, however, is whether the public safety exception to the *Miranda* warnings requirement applies because Officer Farmer admitted that he did not read Dike her *Miranda* rights. The Kentucky Supreme Court recently discussed the public safety exception in *Smith v. Commonwealth,* 312 S.W.3d 353 (Ky.2010). In *Smith,* a search warrant was obtained to search Smith's residence after an investigation caused officers to believe that Smith was engaged in drug trafficking. The police rammed the door of the residence open and found Smith in her bedroom, where she was immediately handcuffed. Without advising Smith of her *Miranda* rights, the police officer

> asked her if she had any drugs or weapons on her. Smith replied to the effect that "she had something in her pocket." Based upon this response, [the officer] found and removed a packet containing four rocks of crack cocaine from Smith's pants pocket. This cocaine served as the basis of her indictment for trafficking in cocaine and her eventual conviction for possession of the drug.

*Smith,* 312 S.W.3d at 356. (Footnote omitted).

Smith moved to suppress the statement she had made, and the trial court held that her statement was admissible. Smith appealed, and the Commonwealth argued

> that even if Smith's statement was a product of custodial interrogation, the statement was nevertheless admissible pursuant to the public safety exception identified in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), which [the Kentucky Supreme Court] adopted in *Henry v. Commonwealth,* 275 S.W.3d 194 (Ky.2008).

*Smith,* 312 S.W.3d at 359.

The Court in *Smith* continued, explaining that in

*Quarles,* the United States Supreme Court recognized an exception to the *Miranda* warning requirement which would allow the admission of a statement made in response to a custodial interrogation if the questioning was designed to elicit an answer to protect the public. In *Quarles,* police were pursuing a rape suspect who abandoned a gun in a grocery store. Upon apprehending the suspect, a police officer asked him where the gun was without Mirandizing him, and the suspect stated where the gun was located. The Court held that the statement regarding the gun's location was admissible stating, "We do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by concern for the public safety."

*Smith,* 312 S.W.3d at 359–60 (quoting *Quarles,* 467 U.S. at 655–656, 104 S.Ct. 2626).

The *Smith* Court held that unlike in Smith's case,

> *Quarles* involved an identifiable and specific danger requiring immediate and unfettered questioning of the defendant to alleviate the risk. As explained in *Quarles:*
>
> > The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use

of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*Smith,* 312 S.W.3d at 360 (quoting *Quarles,* 467 U.S. at 657, 104 S.Ct. 2626).

The Court in *Smith* then held that in Smith's case, the police officer's

> interrogation of Smith was not made in relation to any quantifiable public safety threat. While the Commonwealth argues that the police . . . faced legitimate

safety concerns since weapons could be present in Smith's apartment, a vague belief that a weapon could be present is unlike the certain knowledge in *Quarles* and *Henry* that a gun had been discarded in an area open to the public. If a gun was present in Smith's apartment, it posed no danger to the public at large. Thus, we are persuaded that the public safety exception does not apply.

*Smith,* 312 S.W.3d at 360. Because Smith's statement was the result of a custodial interrogation that occurred without *Miranda* warnings having been provided, and the public safety exception was inapplicable, the Kentucky Supreme Court held that the trial court erred in denying Smith's motion to suppress the statement. *Id.* The Court also held that the error was prejudicial and it was not harmless. *Id.*

The public safety exception also does not apply in the present case. In Dike's case, as in *Smith,* Dike was found by police in a bedroom, she was immediately handcuffed, she was not read her *Miranda* rights, and the officer nevertheless asked her questions of an incriminating nature. Officer Farmer interrogated Dike about the location of drug needles and the type and amount of drugs Dike had ingested. Dike answered those questions, and the evidence that was found based upon her answers was used against her in charging her with the crimes to which she subsequently pleaded guilty.[2]

---

**2.** We note that although Officer Farmer attested that he inquired about the location of the needles after Dike was handcuffed because he did not want to be stuck by a dirty needle, he had already had physical contact with her while handcuffing her and helping her stand up before he asked about the needles. Additionally, Officer Farmer testified that Dike was wearing only a t-shirt when he found her, which should have lessened the likelihood of a needle being hidden on her person. Officer Farmer also attested that he asked Dike those questions about the drugs and needles because he wanted to be able to provide healthcare workers with accurate information to assist them in treating Dike at the hospital. We certainly appreciate his concern for Dike's well-being. However, we are uncertain why Officer Farmer did not take Dike directly to the hospital to seek treatment, even though he said that she was "out of it" and in "bad shape." Rather, he took her to jail first and, upon arriving at the jail, he realized her condition had worsened, so Dike

Pursuant to the reasoning in *Smith*, Officer Farmer's interrogation of Dike about the drugs and needles was "not made in relation to any quantifiable public safety threat," as she was found in a private residence with those items, rather than out in public. *Smith*, 312 S.W.3d at 360. Therefore, the public safety exception does not apply to Dike's case and the circuit court erred in failing to suppress both her statement and the evidence that was discovered based upon her statement. Moreover, because that evidence provided the basis for her charges in this case, we cannot say that the error was harmless, and the Commonwealth makes no argument that it was harmless error.

Accordingly, the judgment of the Graves Circuit Court is reversed and the case is remanded.

ALL CONCUR.

was then taken to the hospital. No explanation was provided for why Officer Farmer took Dike to jail first, rather than to the hospital.